Filed 9/30/15 Unmodified published opinion attached
Order modifying nonpublished opinion filed 8/18/15 (certified for publication
filed 9/11/15), and denying rehearing

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CESAR LOPEZ,<br><br>        Defendant and Appellant. | A139203<br><br>(San Francisco City and County<br>Super. Ct. No. 219514)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>NO CHANGE IN JUDGMENT** |


**THE COURT:**

It is ordered that the opinion filed herein on August 18, 2015, and certified for

publication on September 11, 2015, be modified as follows:

1.  At the top of page 10, delete the following sentence:

San Francisco Police Inspector John Keane testified that this address and
Rizzo's address were not in the same neighborhood and were too far apart
to be walking distance.

Replace the deleted sentence with the following:

Arresting officer Melanie Alvarez testified that this address and Rizzo's
address were not in the same neighborhood and were "too great a distance
to probably walk."

2.  On page 10, in the first sentence of the first full paragraph, insert "Police

Inspector" before "Keane"

1

3. On page 10, insert the following new paragraph at the beginning of footnote 4:

We take judicial notice of the fact that these two addresses are approximately one and a half miles apart.

In the second paragraph of footnote 4, insert "Police Inspector" at the beginning of the first sentence to read:

Police Inspector Keane investigated the return addresses on some of the letters Rizzo received from appellant. The address on the letter mailed August 21, 2012, 2966 24th Street, Mailbox 12, was a storefront with electronic equipment displayed in the front and an insurance business in the back. Keane testified that he was not able to confirm that appellant owned this business, but he believed appellant had "an association" with the place. The address on the envelope Rizzo received on December 5, 2922 Mission Street, was a business consisting of a Laundromat and a connected store, with mailboxes for rent.

The petition for rehearing is denied. There is no change in judgment.

Dated: _____                    _____
                                                                      Kline, P.J.

2

| | |
|---|---|
| Trial Court: | San Francisco City and County Superior Court |
| Trial Judge: | Hon. Harold E. Kahn |
| Attorneys for Defendant and Appellant: | By appointment of the Court of Appeal under the First District Appellate Project<br>Avatar Legal, PC<br>Cynthia D. Jones |
| Attorneys for Plaintiff and Respondent: | Office of the Attorney General<br>Kamala D. Harris<br>Attorney General of California<br>Gerald A. Engler<br>Senior Assistant Attorney General<br>Catherine A. Rivlin<br>Supervising Deputy Attorney General<br>Gregg E. Zywicke<br>Deputy Attorney General |

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CESAR LOPEZ,<br><br>     Defendant and Appellant. | A139203<br><br>(San Francisco City and County<br>Super. Ct. No. 219514) |

Cesar Lopez appeals from a conviction of stalking.  He contends the evidence was insufficient to establish that he made a true threat or that he intended to instill fear in the victim.  We affirm.

## STATEMENT OF THE CASE

Appellant was charged by information filed on February 13, 2013, with one count of stalking.  (Pen. Code, § 646.9, subd. (a).)[1]  Presentation of the case to a jury began on May 10, 2013, and on May 14, 2013, appellant was found guilty as charged.  On July 3, 2013, the court suspended imposition of sentence and granted probation for a period of five years.

Appellant filed a timely notice of appeal on July 8, 2013.

## STATEMENT OF FACTS

Angie Rizzo met appellant at the Mission Library when she was 16 years old and he was about 26.  Rizzo would go to the library after school on Tuesdays to do

---

[1] All further statutory references will be to the Penal Code.

1

homework; appellant would help her with her Spanish homework and she would help him with his English. He referred to himself as "Cesar Cold."

Rizzo saw appellant outside the library on a few occasions: Once they went to the Golden Gate Bridge and walked around the surrounding areas, and once they had lunch at a café. Shortly after Rizzo turned 18, they agreed to meet at a bus stop and go to a movie together. Appellant arrived with flowers and wine for Rizzo and she realized he thought it was a romantic date, which was not what she had anticipated. The movie they went to see was "extremely graphically sexual in nature" and throughout, appellant was kissing Rizzo and trying to grope her. She went along with it because she was "very young" and nervous and did not know how to get out of the situation. After the movie, at appellant's insistence, she allowed him to walk her home to her mother's house.

After that night, she did not return to see him at the library and did not make any other effort to see him. He called her at her home repeatedly; she tried to avoid his calls. He stopped calling and began sending emails several times a week that were angry in tone and "had some sort of accusatory statements along with manifesto like writings," most of them several thousand words long. The emails made Rizzo feel uncomfortable and angry. She did not respond and stopped reading them, and hoped they would end when she left for college.

Rizzo left for college in Los Angeles, but the emails did not stop. During her first semester, appellant emailed that he was coming to Los Angeles to see family and wanted to get together and talk. She agreed because he was her friend and she wanted to talk to him about the emails, to find out "what was going on with him." When they met, appellant was "different," "much more distant" and "very quiet." He did not have much to say about the emails and referred to "a lot of esoteric and intellectual concepts" that she felt were of "his own making" and she did not understand. She decided to cut off all communication with him.

About a year later, appellant began sending packages to Rizzo's mother's address, doing so once or twice a year for five or six years. Rizzo did not know whether he

2

continued to email her because she changed email accounts and eventually stopped checking the one appellant used.

In April 2012, when Rizzo turned 26, she received a birthday card containing a fresh flower in the mail from appellant. In early 2012, she began receiving messages on Facebook from "Crystal Snow Lovestar" that she ignored because she did not know anyone by this name and thought they were spam. In July, however, she opened one of these messages because it had the word "Bernal" on it, which was where she lived. The message included a picture of a labyrinth made of small rocks in the image of Rizzo's face. Rizzo recognized the location of the labyrinth as about five blocks from her home, a place where she ran almost daily. It was "extremely large" and the image looked very similar to a portrait appellant had painted of Rizzo back when they were meeting at the library. The picture was labeled "artwork and picture by CSR Cold," which Rizzo recognized as appellant's name, and wording on the labyrinth read "H&M, NG's Labyrinth." Rizzo knew it had to do with her because "Ng" sounded like her name, Angie. She did not know what H&M referred to, but later learned it was "heart and mind."

Rizzo immediately went up to Bernal Hill, where she found the labyrinth. She described it as the face of a girl, wearing glasses, with long hair, a beauty mark on the left side of the face and green leaves for the eyes. Rizzo had a beauty mark on the left side of her face and green hazel eyes. Rizzo took photographs of the labyrinth, which were shown to the jury at trial. Seeing the labyrinth, she got "very scared." She and appellant had not seen each other in at least six years and she had not realized he was still thinking about her to this extent. On the labyrinth, there was a depiction of a heart, in the center of which was a typed letter in a plastic sleeve, held down by a rock. The letter said it took about eight hours to create the labyrinth and stated, " 'yet you are always trapped into some sort of labyrinth like right here and now if you've already taken a walk through my friend's complexed, dreams, desires, ideas, memories, ego, subconscious, in order to get to know her mind and conquer her heart of stone, good luck.' " Rizzo felt "deeply disturbed" when she read this.

3

Rizzo went back to look at the messages she had received from Crystal Snow Lovestar previously. One had an image of flowers near the Golden Gate Bridge, commemorating Rizzo and appellant meeting 10 years before. Looking at the public profile for the Facebook account of Crystal Snow Lovestar, Rizzo saw a picture of appellant. Rizzo also looked at a blog, the link for which had been included in the letter she found on the labyrinth. The blog was about her, with so much content that it took her "pretty powerful" computer "a while" to load, including audio files "about songs with girls with green eyes," an archive of multiple letters appellant had written to Rizzo, pictures of the "flower commemoration" which appellant was calling an " 'Angiesary'" commemorating a 10-year anniversary. Rizzo felt "really, really scared and freaked out." She sent appellant a message on Facebook saying " 'Hi, Cesar. I do not know what you want from me, but what you are doing is making me feel uncomfortable and not safe. Please stop. Why are you doing this?' "

Two days later, Rizzo received a package from appellant at her mother's home that included a "lengthy" letter, several CDs, the Golden Gate Bridge flower picture and some pictures of the labyrinth. The letter began, " 'It has been a long while since the last time I wrote to you. A hobby that I love doing and you dislike reading. I'm sorry in advance about this one.' " Asked how she felt reading this, Rizzo testified, "I've gotten so many of these letters that it—for me, it's like, here we go again, because almost all the letters are somewhat the same in terms of him just reliving and recounting every single time we ever met. And, again, going into these spiritual-and-manifesto like ramblings." The letter stated, " 'Everybody has fears. How about yours? Perhaps one of your fears is reaching—is me reaching or writing you from the distant time space, that is to say, getting back in touch with you. Well, it just became real! What are your [*sic*] going to do about it, denial, run and hide or bravely face it? Or better yet, overcome your fears and transmute them into love. Right. This life is full of challenges.' " Rizzo felt frustrated, angry and afraid. The letter continued, " 'However, we are all manipulated by what I called spiritual parasites, "demons," that are embedded in our minds.' " This made Rizzo think appellant was delusional and "probably not the most mentally stable

person." She testified, "I realized how fixated he was and how determined he was to reach me and get in contact with me and to somehow resolve whatever it was he was going through, I was very scared because I didn't know what he would do next. He had been writing me for six years and longer trying to get in touch with me and created multiple blogs about me and the labyrinth, that I just didn't know what was going to come next. At this point, I was very afraid to leave my home by myself."

Appellant responded to Rizzo's Facebook message asking him to stop contacting her with a message in which he "dismisses the fact that I said I was scared" and "goes on about not stressing myself and . . . should just enjoy how beautiful it is, and how happy he is to hear from me. And he says that he'll be there that following weekend at 2:00 p.m." She did not respond to this message, then received another in which appellant said, " 'You and me will perform a special ceremony at H&M labyrinth to cleansing [*sic*] any remaining past emotional and psychological harm that we might have caused one another.' "[2] He asked Rizzo to " 'dress all in white, if possible.' " At this point, Rizzo was "really scared" and, on July 22, she contacted the police. She was only able to provide appellant's first name, however, as she did not know where he lived or his phone number.

In early August, Rizzo took her neighbor to see the labyrinth. About 100 yards from the labyrinth, she saw a hooded figure and realized it was appellant. Rizzo grabbed her neighbor's arm and they walked away as fast as they could; looking back, Rizzo saw appellant watching them. A few hours later, she got a Facebook message from Crystal Snow Lovestar saying he had seen her with a friend and wanted to talk to her but decided

---

[2] The message, reproduced in the clerk's transcript, continued after the line Rizzo read to the jury, "Then if you want to, we'll go to the Indian fest and have free veggy meals. Finally we'll go to the seacleat [*sic*] labyrinth to the closing purifying ceremony. It will be fun. [¶] Afterwards we'll be free to say adios and take separate ways in life. I'll give you more details there."

not to.  The message said, " 'But should I let die my heart's dream to find peace and reconcile us, or do you elect Chestees (phonetic spelling) idea on how to work it out?' "[3]

On August 9, San Francisco Police Sergeant Ricardo Castillo sent an email to "Cesar" at the address Rizzo had provided in her police report, "lovestar12@live.com." The next day, appellant replied, asking what this was about, and Castillo explained that Rizzo had made a stalking/harassment complaint, and asked for Cesar's real name and birth date.  Appellant responded that the complaint was " 'exaggerated' " and " 'not something to be really concerned about' "; he and Rizzo had been in touch on Facebook for several months; and " 'perhaps one of [his] messages or artworks really upset her and caused her to make a police report' " but " 'we know how . . . intolerant a girl is these days.' "  Appellant said, " 'I will apologize for any inconvenience I've caused her, and then we can all go on with our separate lives.' "  He did not respond to Castillo's question about his name and birth date.  Castillo spoke with Rizzo, who confirmed that she did not believe appellant would harm her and he had never threatened her.

On August 21, appellant sent Rizzo a package containing a CD, a postcard of Vincent Van Gogh with a note on the back, a play list, a hand-made card, and a letter that referred to the police department's involvement and indicated he was going to stop contacting her because he wanted to make her feel "happy and safe."  She felt hopeful that he would stop.  The letter referred to Rizzo having blocked him from contacting her on Facebook, although she had not done so.

On August 31, Castillo emailed appellant again, saying he hoped appellant had moved on and stopped contacting Rizzo and again asking for appellant's real name and birth date.  Appellant replied that he had apologized to Rizzo and never intended to harass or stalk her.  He said that he and Rizzo lived in the same neighborhood and attended " 'similar places,' " and that he " 'shouldn't move over somewhere just because

---

[3] As reproduced in the clerk's transcript, the message appears slightly different from what Rizzo read to the jury:  The last line quoted above, some of which is not legible, says, "or do you've a less . . . idea on how to work . . ."

6

she feels uncomfortable.  Besides, I have not committed any crime and I have no intentions to do so.' "

On September 24, around dinnertime, San Francisco police officers went to the area of the labyrinth at Bernal Hill and contacted appellant.  Appellant was "odd and evasive."  He gave his name as Noland Avery and gave a phone number that turned out to not work, then gave another number.  He gave his address as 2699 24th Street.  Appellant was detained briefly.  About 8:00 p.m. that evening, Rizzo was walking home from the house of a friend who lived near 18th and Mission Streets.  As she was about to walk under some scaffolding at the corner of Mission and Cesar Chavez Streets, appellant stepped out.  They said hello and Rizzo said, "I just want to let you know that what you've been doing has been frightening me and scaring me, and that's why I got the police involved.  But I haven't charged you with anything."  Appellant looked upset and said, " 'well, I just got arrested.' "

Two days later, Rizzo received an envelope from appellant that was a different style from prior ones, with a return address of  "C.L.S." rather than the previously-used Cesar Cold.  The envelope contained a note that was much shorter than previous ones and a dog-tag necklace with engraving saying, "Golden Gate Anniversary 75th, San Francisco, California, Angie and Cesar."  Rizzo felt "really violated and disappointed that he wasn't stopping" and "very disturbed by the necklace with our names engraved on it."  The letter asked Rizzo to meet him.

On October 8, Rizzo was talking on her phone at a bus stop at 30th and Mission, a block and a half from her home.  She felt someone standing behind her and turned to see appellant, two or three feet behind her, "just looking" at her.  She ran home in tears.

On October 9, Rizzo received a letter in an envelope on which the address was handwritten in appellant's handwriting.  The return address was "Crab Club" in Santa Clara.  The letter began, " 'This is my last personal message, the farewell letter.  I had to send it to end all the troubles I caused you.  I ultimately wanted to personally apologize and try to end our differences and all the issues generated from my messages and say definitely good-bye as we want it.' "  The envelope also  contained a second letter, a copy

7

of a "previous good-bye letter from 2010." Rizzo testified that as much as she hoped appellant could move on, it was "very, very apparent that he couldn't." She was "beyond frustrated" and "suffering from severe anxiety every time I received a letter or even had to go outside." She worked from home and left the house infrequently, sometimes preparing to go out and meet a friend and then being unable to go outside for fear he would be there. She testified, "I didn't know if he was following me or what. But at this point, I ran into him [on] so many occasions so close to my house."

On November 5 or 6, Rizzo was sitting in the back of a bus coming home when she saw appellant sitting in the front. She got up and stood with her back toward him, intending to disembark before there could be any kind of confrontation between them. She felt two hands "put rather roughly" on her shoulders and heard appellant say something like "Angie, it's me." The bus stopped and she got off, telling appellant, "I don't want to talk to you, please don't touch me." she was "very shaken and ran home and having an anxiety attack and crying." Rizzo later clarified that she did not think appellant meant to be rough when he put his hands on her shoulders on the bus but it was "very startling" and felt rough to her.

On November 13, returning from a class about 9:00 p.m., Rizzo again saw appellant at 30th and Mission. She had resolved to confront him the next time she saw him and try to make him understand that he was scaring her. She told him he was scaring her, she had no desire to have anything to do with him, she did not want him to ever contact her again, and she was not interested in resolving anything with him. Appellant was apologetic and they "somewhat" agreed that if they saw each other on the street they would just say, "hello." He asked if he could give her a hug; she said "no" and walked away.

On November 24, Rizzo saw appellant about two blocks from her house, on a street uphill from her house toward Bernal Hill. She smiled, waved, said hello and tried to move past him but he stopped her and asked to talk. She said she did not want to talk to him; he pleaded that he did not understand why they could not be friends. "Almost frantic," she told him again that his conduct was stressing her and she did not want

8

anything to do with him.  He listened to her at first, then became "frustrated" and started shifting from one foot to the other, "huffing and puffing a little bit" and trying to interrupt her with statements like "you are letting your fears rule you, and why can't you just, like, show your love" or "embrace the loving side of yourself."  He told her, " 'You are not the same as you used to be,' also referring to a 16-year-old me."  He also told her that he forgave her for calling the police on him.  She reiterated that he had to leave her alone and he finally said, " 'so, it's over?' and act[ed] like we were breaking up."  She thought if she played along with him he might "get it" and "get over the obsession" and so said, "Yes, it's over."  Appellant said, " 'No, I can't accept it.  I cannot accept that it's over.' "  Rizzo felt hopeless, that there was nothing she could do to make him stop.

On December 5, Rizzo received a red envelope addressed to her in appellant's handwriting.  The top line of the return address was a link to a blog, "love forgiven.blogspot.com."  The envelope contained a CD of songs and a napkin with drawings and words in appellant's handwriting on it.  On one side there was a heart with arrows pointing toward it, on the other was a "swirly" and a link, inside was a snowflake and something else.  Words on the side of the heart read, "Bernal Hill, 12-8-12, 4:30 P.M."  Rizzo felt disappointed and knew appellant was inviting her to meet him at Bernal Hill at the specified date and time.  She went to the link and found a long letter in blog form, with more pictures of the labyrinth and "some other famous drawings."  In this letter, appellant invited her to meet him for another "healing ceremony" on that date.  Rizzo was "really, really fed up . . . and just feeling like it was never going to stop, and— yeah, just that he didn't care that I was scared."  Knowing that appellant insisting on continuing despite the police being involved and Rizzo begging him to stop left her feeling "intense anxiety and fear and a sense of hopelessness in the situation."  Her "only hope was that the police could help in some way."

Rizzo contacted the police inspector assigned to the case, and appellant was arrested at Bernal Hill on December 8.  When initially detained, appellant identified himself as Oscar Lozetti.  After being arrested and taken to the police station, appellant told the police his name was Cesar Lopez and gave a different birth date than the one he

9

had originally given them. He gave his address as 2803 22nd Street. San Francisco Police Inspector John Keane testified that this address and Rizzo's address were not in the same neighborhood and were too far apart to be walking distance.[4]

Keane testified that had received an email from Castillo stating that on August 19 Castillo had confirmed with Rizzo that she did not believe appellant would harm her and had never threatened to harm her. In an email to Keane about the September 24 incident, Rizzo said, "I don't think he understands how his actions are disturbing me." Keane testified that Rizzo told him she was afraid of appellant's conduct and it was affecting the way she lived her life, but not that he had ever threatened her. Rizzo, asked on cross examination about telling Castillo she did not think appellant would harm her, testified, "At that point, I believed that it was true that he wouldn't harm me, but now I can't say that."

Rizzo testified that she told her family and friends about the situation with appellant because she was "afraid for myself" and "needed people around me to know what was going on. . . . I didn't know what was going to happen and I felt in fear for my safety." She told people at work because she had to take time off to deal with the situation. She cut her hair in the hope that appellant would not recognize her if she ran into him. She acknowledged that she never saw appellant following her and he never explicitly threatened her with violence.

---

[4] Keane investigated the return addresses on some of the letters Rizzo received from appellant. The address on the letter mailed August 21, 2012, 2966 24th Street, Mailbox 12, was a storefront with electronic equipment displayed in the front and an insurance business in the back. Keane testified that he was not able to confirm that appellant owned this business, but he believed appellant had "an association" with the place. The address on the envelope Rizzo received on December 5, 2922 Mission Street, was a business consisting of a Laundromat and a connected store, with mailboxes for rent.

10

Appellant contends the evidence was insufficient to support his conviction. He maintains that there was no evidence his conduct communicated an intent to use unlawful violence and, absent such intent, his conduct was protected by the First Amendment to the United States Constitution. Additionally, he urges there was no evidence he intended to instill fear in Rizzo.

Section 646.9, subdivision (a), provides: "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year, or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison."

The statute defines "credible threat" as "a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (§ 646.9, subd. (g).) "Constitutionally protected activity" is expressly excluded from the definition of "credible threat." (§ 646.9, subds. (f), (g).)

"Claims challenging the sufficiency of the evidence to uphold a judgment are generally reviewed under the substantial evidence standard. Under that standard, ' "an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a

11

reasonable doubt." ' (*People v. Bolden* (2002) 29 Cal.4th 515, 553, quoting *People v. Kipp* (2001) 26 Cal.4th 1100, 1128; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320.) ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' (*People v. Bean* (1988) 46 Cal.3d 919, 933, quoting *People v. Hillery* (1965) 62 Cal.2d 692, 702.)" (*In re George T.* (2004) 33 Cal.4th 620, 630-631 (*George T.*).)

Appellant contends, however, that because his insufficiency of the evidence claim was based on his conduct being protected by the First Amendment, this court must engage in independent review, deferring to the trier of fact's credibility determinations but independently examining the record, including the "constitutionally relevant facts." (*George T., supra,* 33 Cal.4th at pp. 632, 634.) *George T.* held that "a reviewing court should make an independent examination of the record in a section 422 case when a defendant raises a plausible First Amendment defense to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal threat." (*Id.* at p. 632.) *George T.* explained that independent review is necessary in cases involving First Amendment issues " 'because the reaches of the First Amendment are ultimately defined by facts it is held to embrace' and an appellate court must decide 'whether a given course of conduct falls on the near or far side of the line of constitutional protection.' (*Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc*. (1995) 515 U.S. 557, 567, citing *Bose* [*Corp. v. Consumers Union of U.S., Inc.* (1984)] 466 U.S. [485,] 503.)" (*George T.*, at p. 632.)

The Attorney General offers no response to appellant's invocation of the independent review standard, simply reciting the usual rule of substantial evidence review. *George T.,* as indicated above, was concerned with a criminal threat under section 422, and appellant cites no authority applying independent review to a stalking conviction. According to our research, the few published cases considering the sufficiency of evidence to support a conviction under section 646.9 since *George T.* was

12

decided have conducted a substantial evidence review without reference to *George T.*, perhaps because the parties in those cases did not raise First Amendment issues. (*People v. Uecker* (2009) 172 Cal.App.4th 583, 593-594 (*Uecker*); *People v. Zavala* (2005) 130 Cal.App.4th 758, 766; see *People v. Itehua* (2014) 227 Cal.App.4th 356, 360.) We do not find it necessary to determine which standard applies in the present case because we would affirm under either one. We note, however, that if independent review is appropriate, it is applicable only to issues that could implicate the First Amendment, such as the content of appellant's communications; sufficiency of the evidence to support the jury's finding on intent is determined according to the usual substantial evidence standard. (See *In re Ernesto H.* (2004) 125 Cal.App.4th 298, 308[finding that statement was threat under section 71 (threatening public employee) subject to independent review; intent to interfere with teacher's duties reviewed for substantial evidence].)

With respect to the content of his communications, appellant argues that the only speech that can be excluded from First Amendment protection is a "true threat." He relies upon *Virginia v. Black* (2003) 538 U.S. 343, 359 (*Black*), which he describes as holding that "[e]xpressive conduct is protected by the First Amendment as long as it does not threaten the use of unlawful violence." *Black*, which was concerned with a statute "banning cross burning with 'an intent to intimidate a person or group of persons' " (*id.* at p. 347), explained that "[t]he First Amendment permits 'restrictions upon the content of speech in a few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." ' " (*Id.* at pp. 358-359, quoting *R.A.V. v. City of St. Paul* (1992) 505 U.S. 377, 382–383.) One example of permissible regulation the Court offered is a state banning a " 'true threat.' " (*Black*, at p. 359.) " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. (See *Watts v. United States* [(1969) 394 U.S. 705,] 708 ('political hyberbole' is not a true threat); *R.A.V.* [, at p.] 388.) The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and

13

'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' (*Ibid.*)" (*Black*, at pp. 359-360.) "[S]tatutes criminalizing threats must be narrowly directed against only those threats that truly pose a danger to society." (*In re M.S.* (1995) 10 Cal.4th 698, 710.)

Appellant argues that his public art and writings—the labyrinth and blogs—were expressive conduct that did not communicate an intent to commit a violent act and were covered by the First Amendment. He offers *In re Ryan D.* (2002) 100 Cal.App.4th 854 (*Ryan D.*), and *George T., supra,* 33 Cal.4th 620, as examples of more threatening expressive works that have been found within First Amendment protection. In *Ryan D.*, for an art project, the minor turned in a painting depicting him shooting an officer who had arrested him a month earlier, blowing away pieces of her flesh and face. (*Id.* at p. 857.) Reversing the juvenile court's finding that the minor made a criminal threat (§ 422), the *Ryan D.* court explained that the painting itself was ambiguous as an expression of intent and the surrounding circumstances, including the fact that the minor offered the painting as an art project in school rather than making any effort to ensure the officer would see it, indicated it was an expression of anger rather than a criminal threat. (*Id.* at pp. 863-865.) In *George T.,* the minor showed several students a poem he had written, the last lines of which read, "I slap on my face of happiness but inside I am evil!! For I can be the next kid to bring guns to kill students at school. So parents watch your children cuz I'm BACK!!" (*George T., supra,* 33 Cal.4th at p. 625.) Noting that "[a]s a medium of expression, a poem is inherently ambiguous" (*id.* at p. 635), the court found nothing in the poem itself or the surrounding circumstances to show that the poem was " 'so unequivocal, unconditional, immediate, and specific as to convey to [the two students] a gravity of purpose and an immediate prospect of execution of the threat' " as required for a criminal threat under section 422. (*George T.*, at p. 638.)

*Ryan D.* and *George T.* both involved offenses alleged under section 422, criminal threats based on the content of particular, individual expressions. Here, by contrast, the question is not whether each individual expression communicated the requisite threat but

whether the combination of all appellant's communications, expressions and conduct did so.

Appellant acknowledges that the "credible threat" required for conviction under section 646.9 may be implied from a course of conduct. He emphasizes, however, that the threat requirement is in addition to the requirement of harassment of the victim. The statute defines "harasses" as "engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) Accordingly, appellant argues that the conduct relied upon to demonstrate stalking must do more than just *cause* alarm, annoyance, torment or terror; it must communicate a willingness to resort to violence.

In essence, appellant concedes that the evidence showed he harassed Rizzo but maintains there was no evidence he communicated a willingness to use violence against her. In appellant's view, the cases that have found a threat implied by a course of conduct involved communication of a threat to commit violence that the evidence in the present case did not demonstrate. He points first to *People v. McPheeters* (2013) 218 Cal.App.4th 124, in which the defendant had a history of domestic violence against the victim, violated no-contact orders, moved to an apartment next door to the victim's, contacted her 40 to 50 times in a month, bragged about beating people up and told her someone should beat her up, told her to be careful or something was going to happen to her, and told her the police could not keep him away from her. (*Id.* at pp. 135-136.)

In *People v. Halgren* (1996) 52 Cal.App.4th 1223, the defendant called the victim repeatedly, insisting that she talk to him, after she clearly told him she was not interested, told her she would be sorry she had been rude to him and, later, that she would pay for her rudeness and he would " 'fix her' " or " 'fix this,' " and positioned himself where he could watch people leave the building where she worked. (*Id.* at p. 1233.)

*Uecker, supra,* 172 Cal.App.4th 583, involved two victims. For months, the defendant expressed his interest in going out with the first victim by leaving notes on her car and appearing at the car every day when she went to lunch, even if her lunch time

15

varied and after she told him she was not interested and moved to a different parking location. (*Id.* at pp. 586-587.) His last note called her an " 'immature trouble making brat' " for trying to avoid him, asked, " 'What's a guy gotta do to get a call from a beautiful woman?' " and stated he would "be here tomorrow if you want to see me," noting that she had "funny lunch hours." (*Id.* at p. 587.) After she started parking a distance away and having people walk her to her car, the defendant was seen in his truck, positioned with a good view of the parking lot entrance and employee entrance. (*Id.* at p. 588.) The court found that "a reasonable jury could have found that defendant made an implied threat to her safety in that he was going to do whatever he needed to get M. to go out with him," that she "reasonably feared for her safety" and that "his last note to her evidenced hostility toward her, and his final action of positioning himself where he could see her comings and goings at work signaled he was not going to take no for an answer." (*Id.* at p. 595.)

The defendant contacted the second victim, a real estate agent, multiple times a day in the guise of looking for a property but never provided the information she pressed him for to help him qualify for a loan; he told her she had a " 'really cool voice' and he could ' "[p]robably talk to [her] all day[,]" ' " hinted she should take him to look at properties "in the boonies," became irate when she did not return a call, and after she told him she was leaving the residential real estate market, insisted he wanted to " 'finish this with [her],' wanted her to 'handle [his] issues,' and he wanted 'out of Dodge and by now, [she] probably kn[e]w why.' " (*Uecker, supra,* 172 Cal.App.4th at pp. 588, 596.) The last of these comments indicated he knew the victim had learned he was a sex offender. (*Ibid.*) The court found that the "unrelenting conduct over the course of three weeks that toward the end became hostile and demanding, perpetrated by someone who is a sex offender and had no legitimate interest in real estate," was sufficient to demonstrate a credible threat. (*Id.* at p. 596.)

In *People v. Falck* (1997) 52 Cal.App.4th 287, the defendant sent the victim a dozen black roses and wrote her two or three letters a day discussing astrology and how they were meant to be together for eternity. After being arrested and put on probation, he

16

mostly stayed away from the victim for 12 years, at which point he began to call her home and, after her husband told him a police report had been filed and the victim changed her phone number, sent her letters that included pictures of the victim and himself, pornographic pictures from magazines that he indicated represented her, astrological references, discussions of sexual acts he wished to experience with her and his intention to marry her, as well as a list of his lifetime accomplishments, including that he was very good with an M-16 automatic rifle. (*Id.* at pp. 291-292, 298.) The court noted, among other things, that the defendant's references to eternity and the rifle could be construed as an intention to kill the victim and commit suicide so they could be together for eternity, that the gift of black roses had sinister overtones and that the defendant "made it abundantly clear that his desires took precedence over the victim's wishes" as his obsession continued over 12 years despite the victim's efforts to ensure he would not contact her. (*Id.* at p. 298.)

*People v. McPheeters, supra,* 218 Cal.App.4th at pages 135-136, involved an express threat—telling the victim someone should beat her up and she should be careful or something was going to happen to her. *Halgren* and *Falck* involved all-but-direct ones —in *Halgren,* the defendant told the victim she would be sorry she had been rude to him, she would pay for her rudeness and he would " 'fix her' " or " 'fix this' " (*Halgren*, *supra*, 52 Cal.App.4th at p. 1233) and in *Falck*, the defendant described his desire to be with the victim for eternity and his proficiency with an automatic rifle (*Falck*, *supra*, 52 Cal.App.4th at p. 298). In *Uecker*, the facts that the realtor victim knew the defendant was a sex offender and was not actually interested in purchasing property increased the apparent seriousness of his conduct. (*Uecker*, *supra*, 172 Cal.App.4th at p. 596.) None of these cases, however, suggest their particular facts set the floor for a course conduct constituting an implied threat.

The communications of the defendant to the first victim in *Uecker*, as in the present case, did not contain overt suggestions of violent intent. As in that case, appellant's stated purpose was to have a relationship with Rizzo or, at least, to reconcile their differences. While the defendant in *Uecker* contacted the victim daily and

17

appellant's contacts with Rizzo were less frequent, appellant continued to contact Rizzo for many years after she attempted to cut off contact with him, escalating his conduct between April and December 2012, to a relentless pursuit despite her repeated attempts to avoid him and pleas for him to stop and despite intervention by the police. That the defendant in *Uecker* was following the victim was obvious from his appearance at her car at its different locations and his positioning himself to watch the entrance to her place of employment. But the evidence that appellant was maintaining his sights on Rizzo was also strong: He constructed the labyrinth at a location only blocks from Rizzo's home, where she ran on an almost daily basis, and specifically drew it to her attention; he made sure she knew he had seen her there after Rizzo went to the labyrinth with her neighbor; he sent letters and packages to Rizzo's home; he appeared at the bus stop a block and a half from her home, on a corner where she went "probably every day," and on a street two blocks above her house toward Bernal Hill; and, on the very evening after he was detained by the police, he appeared on the street where Rizzo was walking home from a friend's house.

Appellant maintains that he lived in the same neighborhood as Rizzo and emphasizes that their in-person contacts occurred in public places and he never went to her home despite knowing where she lived. But the evidence showed that appellant did not live in the Bernal Heights neighborhood where Rizzo lived, yet he repeatedly appeared in locations very close to her home—not only Bernal Hill Park itself, but the bus stop she used and a street within two blocks of her home. His appearance from under the scaffolding on a building as Rizzo was walking home on the night of appellant's detention is particularly telling: Unlike the bus stop, for example, this was apparently not a location Rizzo would be found regularly, as she had been visiting a friend. While it is of course possible appellant happened to be on that street, under the scaffolding, at just the time Rizzo was walking by, the fact that this incident occurred only hours after appellant was detained raises an obvious inference that it was not a coincidence.

The evidence demonstrates that appellant was obsessed with Rizzo over a period of many years, contacted her repeatedly despite her efforts to stop him directly and

18

through involving the police, and made clear both that he knew where she lived and where she went, and that he would not accept her ending what he perceived to be their relationship. After Rizzo stopped communicating with appellant during her first year of college, he maintained a presence in her life, sending packages to her at her mother's address once or twice a year for five or six years. In April 2012, appellant's contacts became more frequent and obtrusive. He sent Rizzo a birthday card containing a fresh flower, and multiple messages on Facebook in the name "Crystal Snow Lovestar." He sent pictures of flowers near the Golden Gate Bridge as a commemoration of the 10-year anniversary ("Angiesary") of his meeting her. Appellant constructed, and sent Rizzo pictures of, an "extremely large" labyrinth in the image of Rizzo's face in a public park near Rizzo's home, where she ran "almost daily." A letter placed on the labyrinth referred to Rizzo's "dreams, desires, ideas, memories, ego, subconscious" and getting "to know her mind and conquer her heart of stone," and provided a link to a blog containing audio files about girls with green eyes, pictures of the "flower commemoration," and an archive of letters appellant had written to Rizzo.

When Rizzo responded to all this with a message on Facebook telling appellant he was making her feel "not safe" and asking him to stop, he sent her a long letter, CDs, the Golden Gate flower picture, and pictures of the labyrinth. The letter acknowledged that Rizzo did not want his attentions, describing his letters as a "hobby" he "love[d] doing" and she "dislike[d] reading," and stated, after suggesting that one of Rizzo's "fears" was his getting back in touch with her, " 'Well, it just became real! What are your [*sic*] going to do about it, denial, run and hide or bravely face it?' " Appellant also asked Rizzo to attend a "cleansing" ceremony at the labyrinth, for which he asked her to dress all in white. Rizzo saw appellant watching her at the labyrinth, and he sent her a message saying he had wanted to talk to her but decided not to and referring to his "heart's dream" of them reconciling. After first being contacted by the police, appellant sent Rizzo another package; hours after being detained by the police in September, he appeared as Rizzo was walking home from a friend's house. Despite her telling him that he was scaring her to the point she had called the police, he sent her yet another package

19

including a dog-tag necklace with engraving saying, "Golden Gate Anniversary 75th, San Francisco, California, Angie and Cesar." In October, appellant was at the bus stop a block and a half from Rizzo's home, "just looking at her." The next day she received a letter purporting to be his last, along with a copy of previous goodbye letter he had sent her two years before. In early November, appellant startled Rizzo by putting his hands on her shoulders from behind when she was trying to avoid him; a week or so later he was again at the bus stop corner near her home. Later in the month, on the street two blocks from her home, as she told him, "almost frantic," that she wanted nothing to do with him, he told her he could not accept their relationship being over. He then sent her another invitation to meet at the labyrinth for a "healing" ceremony, with a link to a long letter and more pictures of the labyrinth.

The absence of overt threats in appellant's communications notwithstanding, the course of conduct in which he engaged constituted a credible threat within the meaning of section 646.9, subdivision (g): a "threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family." Such threats "pose a danger to society and thus are unprotected by the First Amendment." (*Falck*, *supra,* 52 Cal.App.4th at pp. 296-297.) Appellant's construction of the labyrinth, the content of his blogs, messages, letters and packages, and the persistence with which he contacted Rizzo despite being told to stop by her and by the police, reveal an obsession that a reasonable person would understand as threatening. The labyrinth, in addition to communicating his obsession, sent a clear message that appellant knew where Rizzo was and was close by. His invitations to Rizzo to meet him for cleansing or healing ceremonies at the labyrinth,

20

dressed in white, conjured images of undefined rituals that would be understood by a reasonable person as lending an ominous tone to the persistent contacts.[5]

Appellant's argument that the evidence showed only that he had knowledge he was scaring Rizzo, not that he intended to scare her or to hurt her, is also unpersuasive. " '[T]he element of intent is rarely susceptible of direct proof and must usually be inferred from all the facts and circumstances disclosed by the evidence.' (*People v. Kuykendall* (1955) 134 Cal.App.2d 642, 645; see also *People v. Lyles* (1957) 156 Cal.App.2d 482, 486.)" (*Falck, supra,* 52 Cal.App.4th at p. 299.) Appellant not only ignored Rizzo's increasingly impassioned pleas to stop contacting her because he was scaring her, he responded with further contacts, continuing even after the police became involved. There can be no question appellant knew he was causing Rizzo fear. When contacted by the police in August, appellant acknowledged that his messages or artwork might have "upset" Rizzo, and he told her after he talked to the police that he would stop contacting her because he wanted her to feel "happy and safe." Rizzo told him in September that she had contacted the police because he was frightening and scaring her,

---

[5] Respondent likens appellant's references to cleansing or healing ceremonies to "horror movies or satanic rites in which a victim must be sacrificed in order to purify others and attain salvation," citing a news article about a woman who died when candles apparently accidentally ignited a flammable liquid being used in a Santeria cleansing ritual (*She Dies in Ritual*, New York Daily News (Feb. 25, 2004)) and a news article reporting that the stomping death of a woman during an exorcism had been ruled manslaughter, not murder, because the missionaries conducting the ritual were trying to heal, not harm, the victim (*Judge Rules Exorcism Death Manslaughter,* Los Angeles Times (Apr. 17, 1997)). Putting aside the fact that these reports of apparently unintended deaths resulting from ritual ceremonies do not support respondent's invocation of ritual human sacrifice, it is not necessary to go this far to see the threat conveyed by appellant's references to cleansing and healing ceremonies. Again, the point is not what appellant's invitations signified in and of themselves, but how they factored into his overall course of conduct. Appellant's argument that healing ceremonies and the tradition of wearing white are positive events associated with major religions (such as a Christian baptism) ignores the context in which his invitations were extended—a context demonstrating an obsessive insistence that Rizzo comply with his desires. The image of a "cleansing" or "healing" ceremony need not suggest human sacrifice to suggest a threat to the physical safety of a person being endlessly pursued despite all efforts to terminate contact.

21

and told him again at the bus stop in November that he was scaring her; on the latter occasion, appellant told her he was sorry for scaring her.  Appellant maintains that despite his *knowledge*, he had no *intent* to instill fear in Rizzo, that he only wanted to reconcile with her.  But his persistence in the face of Rizzo's efforts to avoid him and make him understand the degree of fear he was causing her, including going to the police to stop him, amply supports the inference that he intended the result he caused.  (*Falck,* at p. 299 ["it can be inferred that appellant intended to cause fear in the victim from the fact that he insisted on maintaining contact with her although she clearly was attempting to avoid him, and although he had been warned away by the police, the court and the victim's husband"]; *People v. Kelley* (1997) 52 Cal.App.4th 568, 578 [sufficient evidence of intent to cause fear despite absence of express threats and evidence of defendant's affection and concern for victim].)

## DISPOSITION

The judgment is affirmed**.**

_____
Kline, P.J.


We concur:


_____
Richman, J.


_____
Stewart, J.

22

Filed 9/11/15 after filing of
unpublished opinion on 8/18/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>CESAR LOPEZ,<br><br>          Defendant and Appellant. | A139203<br><br>(San Francisco City and County<br>Super. Ct. No. 219514)<br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION** |

**THE COURT:**

The opinion in the above-entitled matter filed on August 18, 2015, was not certified for publication in the Official Reports.  For good cause, the request for publication is granted.

Pursuant to California Rules of Court, rule 8.1105(b), the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

Dated: _____                    _____

                                                                    Kline, P.J.

1

Trial Court:                              San Francisco City and County Superior Court

Trial Judge:                              Hon. Harold E. Kahn


Attorneys for Defendant and Appellant:  By appointment of the Court of Appeal
under the First District Appellate Project
Avatar Legal, PC
Cynthia D. Jones

Attorneys for Plaintiff and Respondent:  Office of the Attorney General
Kamala D. Harris
Attorney General of California
Gerald A. Engler
Senior Assistant Attorney General
Catherine A. Rivlin
Supervising Deputy Attorney General
Gregg E. Zywicke
Deputy Attorney General