Filed 9/26/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>BRUCE PETERSON,<br><br>    Defendant and Appellant. | A163458, A163800<br><br>(Contra Costa County<br>Super. Ct. No. 52006922) |

Defendant Bruce Peterson was convicted of stalking a politician and the politician's family.  (Pen. Code, § 646.9; further undesignated statutory references are to the Penal Code.)  The conviction was based on: (1) Peterson's odd comments to the politician's wife at an open house event for a school bond issue; (2) his reposting on Facebook of a publicly available photo of the politician's family along with comments mentioning the open house event and the politician's children; and (3) his mailing of a rambling letter — criticizing local politics and containing a check made payable to "anyone who is not corrupt" — to the politician's wife.  We reverse.  On the specific facts of this case, we conclude a reasonable listener would not have found Peterson's speech or speech-related acts a true threat of violence.

## BACKGROUND

In February 2020, Lafayette City Councilmember and former Lafayette Mayor, Cameron Lee Burks, and his wife, Julia Ackley, hosted an open house event in their home in support of a school bond measure.  The invitation

stated Burks was "hosting this event as an individual resident of Lafayette and a father of school-aged children." Peterson attended and had an "odd" and "stilted" conversation with Ackley, during which he noted it had been 22 days since her birthday. Unaware her birthday was publicly available on her Facebook page, she felt "unnerved," "uncomfortable," and a "little freaked out." Her "spider-sense" that something was amiss was triggered by his odd behavior and appearance; she described him as wearing a shirt with "children's handprints all over it" and a pink fanny pack.

In March 2020, Peterson reposted on his Facebook page a photo from Ackley's public Facebook page. The photo depicted Ackley, and Burks and Ackley's two daughters. Peterson's post stated, "A politician's family. I have never met the younger 2 girls." In the comments, Peterson wondered "where [Burks and Ackley] hid the girls" during the open house event. He mused, "They live near Burton Valley School. Considering the politician, Cameron Burks, has a different name than his wife, I wonder what their daughters' last name is?" He also described Burks as "one of the Mayor's [*Sic.*] who abdicated his throne. But remained in power, on the Lafayette, Ca. City Council." One of Burks's colleagues sent him a screenshot of Peterson's Facebook post. Burks was "alarmed" and "immediately felt" Peterson "could be a threat" to his wife and daughters. But Ackley acknowledged the photo reposted by Peterson was publicly available on her Facebook page, as was her birthdate and other pictures of Burks and her daughters.[1]

In April 2020, Ackley received a "confusing" letter and check in the mail from Peterson. Written on the front of the check was, "Pay to order of anyone who is not corrupt." On the back of the check was written, "Thanks

---

[1] Ackley thought she made her Facebook page private after the March incident, but it remained publicly available as of April 2021.

for hosting the event on February 3rd, 2020. I do not recall your two daughters' names. Are they [. . .] and [. . .] or Molly and Harry?" Molly and Harry are the names of Ackley's parents, but she acknowledged the names and photos of her parents were publicly available at the time.

The letter was addressed to "Julia, 2 unnamed daughters, and their unnamed pets." The rambling letter was a screed against local politics. For example, Peterson said he had "a long list of liars," and Burks's Facebook "tells me that many of the: duplicitous, diabolical, lying, liars from hell, are his friends. Oh! They lied about me. They did not lie about him." He continued, "BTW. I have despised the Lafayette Police Department, since 1966. Before any of you were born. Wow! I've merely despised Lafayette Little League's: nasty, totalitarian jerks, since around 1998? How does a father of 2 daughters, live with himself, being a puppet for those totalitarian, nasty jerks from hell? They are above all laws, in this corrupt, little city."

Although Ackley thought the letter "didn't make a lot of sense" and "was written in a confusing manner," she was "really scared" it mentioned her by name, as well as the names of her daughters, and her parents. She also felt "helpless . . . to protect" her children. The idea that something could happen to her children filled her with a "sense of insecurity" and "doom." For his part, Burks felt "sick to [his] stomach" and "fearful" when he read the letter.

The defense called several witnesses who testified that, although Peterson was distrustful of the government and politicians, he was not violent. They described him as an "unusual" person who was prone to rants and hyperbolic speech — like when he said he "could have strangled the foul creature," referring to a former city supervisor — but there was "[a]bsolutely no follow-through or violence of any kind."

After a jury trial, Peterson was convicted of stalking and sentenced to two years of probation, with one year of home confinement.

## DISCUSSION

Section 646.9, subdivision (a) provides: "Any person who . . . willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking."[2] Thus, the prosecution had to prove Peterson (1) harassed Burks and Ackley, (2) made a credible threat, and (3) did so with the intent to place them in reasonable fear for their safety or the safety of their immediate family. (See *People v. Ewing* (1999) 76 Cal.App.4th 199, 210; see also *People v. Carron* (1995) 37 Cal.App.4th 1230, 1238.)

A person " 'harasses' " when he or she "engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) A " 'course of conduct' " means "two or more acts occurring over a period of time, however short, evidencing a continuity of purpose." (*Id.*, subd. (f).) And a " 'credible threat' " is defined as "a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or

---

[2] Section 646.9 also criminalizes the willful, malicious, and repeated following of another person, but the prosecution did not argue that theory.

4

her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (*Id.*, subd. (g).) The definitions of " 'course of conduct' " and " 'credible threat' " expressly exclude "[c]onstitutionally protected activity" from their ambit. (*Id.*, subds. (f), (g).) But "true threats" of violence are unprotected by the First Amendment. (*Counterman v. Colorado* (2023) __U.S.__ 143 S.Ct. 2106, 2111; U.S. Const., 1st Amend. (First Amendment).) The question here is whether Peterson engaged in constitutionally protected activities, thus precluding his stalking conviction as a matter of law. We conclude the answer is yes.

We begin with the standard of review. The Attorney General invokes the rule that "[c]laims challenging the sufficiency of the evidence to uphold a judgment are generally reviewed under the substantial evidence standard." (*In re George T.* (2004) 33 Cal.4th 620, 630 (*George T.*).) But Peterson correctly notes that, when a challenged finding implicates the First Amendment, the reviewing court conducts an independent review of the record as an added safeguard against infringement of constitutional rights. (*George T.*, at p. 632.) Independent review, "which 'assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact,' . . . 'is a rule of federal constitutional law. It is necessary 'because the reaches of the First Amendment are ultimately defined by facts it is held to embrace' and an appellate court must decide 'whether a given course of conduct falls on the near or far side of the line of constitutional protection.' " (*George T.*, at pp. 631–632, citations omitted.) The Attorney General contends *George T.* requires independent review only for criminal threat convictions (§ 422), not stalking. Citing *People v. Borrelli* (2000) 77 Cal.App.4th 703, 716–717, the Attorney General contends section 646.9

is different because, unlike section 422, it " 'does not regulate the *content* of speech insomuch as *the manner* in which the communication is made. . . . The aim and effect of this statute are not to suppress speech, but to protect individuals in the exercise and enjoyment of their constitutional rights from invasive, oppressive conduct that infringes on those rights.' " [3]

Under the facts of this case, we believe Peterson has the better argument. Peterson's stalking conviction rested entirely on his speech — his remarks to Ackley at the open house event, his Facebook post and comments, and the letter and check — and its dissemination — the acts of posting on Facebook and mailing the letter. Moreover, the speech and its dissemination unquestionably occurred in a First Amendment context, concerning a school bond measure, local politics, and criticism of a politician. (*George T.*, *supra*, 33 Cal.4th at p. 632; *People v. Smolkin* (2020) 49 Cal.App.5th 183, 189 [applying independent review and concluding "as a matter of law, a 'reasonable listener' would not have understood [defendant's] letter to be a true threat"]; *In re Curtis S.* (2013) 215 Cal.App.4th 758, 762 [independently reviewing sufficiency of evidence for disturbing another by loud and unreasonable noise].) Thus, we independently review the conviction under the *George T.* standard.

---

[3] Section 422 provides in part as follows: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury . . . , with the specific intent that the statement, . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

We note, however, that independent review is different from de novo review; we do not make an entirely " 'original appraisal' " of the evidence. (*George T.*, *supra*, 33 Cal.4th at p. 634.)  Rather, we defer to the credibility determinations of the trier of fact, who was "in a superior position to observe the demeanor of witnesses." (*Ibid.*)  Moreover, we independently review only factual findings implicating the First Amendment, such as a finding that the communication at issue was a true threat and therefore unprotected by the First Amendment.  (*George T.*, at p. 634.)  In sum, we generally review for sufficiency of the evidence under the substantial evidence standard, but independently determine whether Peterson's expressive conduct was protected by the First Amendment or was a true threat.

"The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech." (*Virginia v. Black* (2003) 538 U.S. 343, 358 (*Black*).)  Yet its protections "are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution." (*Ibid.*)  As relevant here, the First Amendment "permits a State to ban a 'true threat.' " (*Black*, at p. 359.) " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." (*Ibid.*)  In *People v. Lowery* (2011) 52 Cal.4th 419, 427 (*Lowery*), the California Supreme Court followed *Black* in construing a statute relating to threats of violence against a crime witness or victim "as applying only to those threatening statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a true threat, namely, 'a serious expression of an intent to commit an act of unlawful violence' [citation], rather than an expression of jest or frustration." (*Lowery*, at p. 427.)

As noted, we independently examine the record to determine whether "the speech at issue is an unprotected true threat." (*George T.*, *supra*, 33 Cal.4th at pp. 632–633.) And because the material facts are not in dispute, we make an independent legal determination regarding whether a reasonable person would understand Peterson's remarks to Ackley, his Facebook post and comments, and the letter and check he mailed to Ackley as constituting a " ' serious expression of an intent to commit an act of unlawful violence' " in "light of the context and surrounding circumstances." (*Lowery*, *supra*, 52 Cal.4th at p. 427.)

We conclude, as a matter of law, that a reasonable person would not understand Peterson's speech and its dissemination, whether considered separately or cumulatively, to be a true threat. (*George T.*, *supra*, 33 Cal.4th at pp. 637–638.) To be sure, Peterson's comment to Ackley about the exact number of days that had passed since her birthday was odd, and she was no doubt unnerved by his remark given her unawareness that her birthday was publicly available on her Facebook page. But Peterson's mere reference to her birthday — leaving aside that anyone could find the information on Ackley's Facebook page — could hardly be seen as a " 'serious expression of an intent to commit an act of unlawful violence.' " (*Lowery*, *supra*, 52 Cal.4th at p. 427.) Peterson's remark does not rise to that level; eccentricity and being off-putting is not a criminal offense.

Peterson's Facebook post and comments fare no better. As noted, he reposted a photo of Ackley, and Burks and Ackley's daughters — a photo that was publicly available on Ackley's Facebook page. Peterson's post stated, "[a] politician's family," and in the comments to the post, he questioned the absence of the children at the open house event. He also wondered about the children's last name given that their parents did not have the same last name

as one another. And he described Burks as having "abdicated his throne" as mayor but remaining on the city council. Peterson's comments about the whereabouts and last names of the children were no doubt upsetting and even alarming to Burks and Ackley. But context is critical. The post and comments were made in the context of the school bond measure Burks and Ackley supported as parents of "school-aged children." Moreover, language in the political arena "is often vituperative, abusive, and inexact." (*Watts v. U.S.* (1969) 394 U.S. 705, 708.) Despite the unsettling and even disturbing nature of Peterson's post and comments, the school bond measure at the center of Peterson's speech was unquestionably a matter of public interest. (*Black*, *supra*, 538 U.S. at p. 358 ["The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting."].)

Viewed in the light of the surrounding circumstances (*Lowery*, *supra*, 52 Cal.4th at p. 427), Peterson's Facebook post and comments did not constitute a true threat and they could not reasonably be interpreted as such. References to Burks and Ackley's daughters were surely discomfiting, but a reasonable person would not think, as the Attorney General suggests, that they reflected efforts "to learn about, locate, and contact Burks's teenage daughters." Direct threats of violence are not necessary, but something more than the mere mention of the children was required. (E.g., *People v. Falck* (1997) 52 Cal.App.4th 287, 298 [defendant's desire to spend eternity with victim, coupled with his stated proficiency with a rifle, and gift of black roses suggested murder-suicide]; *In re Ernesto H.* (2004) 125 Cal.App.4th 298, 303–304, 313 [statement, " 'Yell at me again and see what happens,' " along with a step toward victim and threatening stance was a true threat]; *People v. Halgren* (1996) 52 Cal.App.4th 1223, 1232 [statements that victim "would be

9

sorry she had been rude to him," "she would pay for her rudeness," and he was going to " 'fix her' " or " 'fix this' " were threats].) Nothing in Peterson's comments or their dissemination suggested even an implied threat to the children's safety. (*George T.*, *supra*, 33 Cal.4th at pp. 637–638.)

Finally, there is the letter Peterson mailed to Ackley, in which he opined "100% of the politicians and their administrators, who are supposed to represent me, are corrupt." The enclosed check was made payable to "anyone who is not corrupt," and on the back of the check was written, "Thanks for hosting the event on February 3rd, 2020. I do not recall your two daughters' names. Are they [. . .] and [. . .] or Molly and Harry?" The Attorney General concedes the letter and check "criticized Burks's political activities" and were intended "to influence Burks politically." To the extent the Attorney General contends the act of mailing the letter itself constituted a threat, we disagree. The context surrounding the mailing of the letter "fail[s] to show that, as a threat, it was sufficiently unequivocal to convey" an intent to commit an act of unlawful violence. (*George T.*, *supra*, 33 Cal.4th at pp. 637–638.) The Attorney General also insists the "subtext" of these communications was that, because of his "anger about Burks's political involvement," Peterson "was trying to learn about, locate, and contact Burks's teenage daughters." We can discern no such "subtext." This case is different from *People v. Lopez* (2015) 240 Cal.App.4th 436 and *People v. Pineda* (2022) 13 Cal.5th 186, cited by the Attorney General.

In *Lopez*, the defendant engaged in a years-long campaign of letters, emails, packages, and in-person visits to the victim, all with inappropriate and unwanted romantic overtones. (*People v. Lopez*, *supra*, 240 Cal.App.4th at pp. 438–445.) Affirming the stalking conviction, the court held an invitation for the victim to meet the defendant for "cleansing or healing

ceremonies at the labyrinth, dressed in white, conjured images of undefined rituals that would be understood by a reasonable person" as ominous in light of persistent, unwanted contacts. (*Id.* at pp. 453–455.) This is unlike Peterson's two references to the children, neither of which conveyed an inappropriate or threatening undertone.

Similarly inapt is *Pineda*, which involved a defendant who repeatedly called another inmate "a rat" and incited other inmates to join him in chanting " 'Benji is a rat.' " (*People v. Pineda, supra*, 13 Cal.5th at pp. 248–249.) Given that it is well understood snitches are " 'widely reviled within the correctional system,' " *Pineda* held that even though the defendant did not expressly declare that he or someone else would harm Benji, " 'rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render [threat statutes] powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat.' " (*Id.* at p. 249.) No such threats — veiled or otherwise — can be found here.

Also instructive is *U.S. v. Lincoln* (9th Cir. 2005) 403 F.3d 703. There, the imprisoned defendant attempted to send a letter to the President stating he would die soon because " 'they' " promised he would, apparently referring to followers of Osama Bin Laden. (*Id.* at pp. 705–706.) The Ninth Circuit held it was unconstitutional to convict the defendant of threatening the President because the letter was not a "true threat." (*Id.* at p. 706.) The court relied on the absence of a literal threat in the letter, reasoning it "does not connote anything that it does not literally say. To the contrary, it literally says what it means, that President Bush will die because 'they' said he will. The fact that [defendant] stated six months earlier that he planned

11

to shoot the President does not give new meaning to [defendant's] statement that Bin Laden or Al Qaeda will kill the President." (*Id.* at p. 707.) Similarly, in determining whether Peterson's letter and check constituted a true threat, we look at what those documents literally said — which was that politicians were corrupt. The Attorney General's "subtext" argument lacks evidentiary or even circumstantial support.

Having independently examined the record, we conclude Peterson's speech acts were constitutionally protected activities; thus, there is insufficient evidence his conduct violated section 649.9, and we reverse his conviction. In light of our conclusion, we need not address Peterson's other claims. We note, however, that Peterson also argues the trial court prejudicially erred in responding to a jury question during deliberations, and the Attorney General agrees and concedes reversal is required.[4]

## DISPOSITION

The judgment is reversed.

---

[4] The jury asked, "Does a credible threat to one's safety have to only be a physical threat, or can it be nonphysical in nature as well?" Ultimately, the trial court referred the jury to the given CALCRIM No. 1301 instruction on stalking and further explained a " 'credible threat' can be explicit or implied. It includes a threat of causing an injury or some harm to the person, or the immediate family of the named victim." The Attorney General acknowledges it "is reasonably likely that the jury understood" the court's answer as sweeping in conduct that does not constitute a true threat.

_____
Rodríguez, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Fujisaki, J.


A163458 & A163800

Trial Court: Contra Costa County Superior Court

Trial Judge: Hon. Charles B. Burch

Counsel:

Marc J. Zilversmit for Defendant and Appellant.

ACLU Foundation of Northern California, Hannah Kieschnick and Chessie Thacher as Amicus Curiae on behalf of Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Katie L. Stowe, Deputy Attorneys General for Plaintiff and Respondent.