Filed 9/8/22  P. v. Cruz CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079151 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No.  INF2000322) |
| MARIO CRUZ, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Otis Sterling III, Judge.  Affirmed in part; reversed in part; remanded with directions.

Kevin Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Mario Cruz, Jr. of false imprisonment[1] (Pen. Code,[2] § 236); stalking with a prior conviction for the same offense (§ 646.9, subd (c)(2); count 2); and inflicting corporal injury on a dating partner (§ 273.5, subd. (f)(10); count 3).  In a bifurcated proceeding, the trial court struck Cruz's serious felony prior and found two strike priors to be true.

The court sentenced Cruz to prison for 12 years, consisting of the following:  the upper term of five years for count 2, doubled for Cruz's prior strike; and one-third the middle term (one year) for count 3, doubled to two years.  Per section 654, the court stayed Cruz's sentence under count 1 (16 months).

Cruz appeals, contending substantial evidence does not support his conviction under count 2, and the trial court erred in admitting evidence regarding Cruz's domestic violence toward a previous intimate partner.

In addition, while this appeal was pending, we granted Cruz's request to file a supplemental brief regarding whether remand for resentencing was necessary under Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1) (Assembly Bill 518) and/or Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3) (Senate Bill 567).  The People filed a supplemental brief on these resentencing issues as well.

We determine that Cruz's substantial evidence and evidentiary challenges to the judgment are without merit.  However, we believe the prudent course is to remand this matter to the superior court to allow the court to consider its new discretion under Assembly Bill 518 and Senate Bill 567.

---

[1]    False imprisonment was a lesser included offense of count 1 (kidnapping; Pen. Code, § 207, subd. (a)).

[2]    Statutory references are to the Penal Code unless otherwise specified.

## FACTUAL BACKGROUND

### Prosecution

Cruz met Jane Doe in November 2019 when Doe started a job at the same landscaping company where Cruz had been working. Doe left that job at the end of that month and found work at a bakery in Palm Springs. The two began dating in mid-December.

At the end of December, after Doe saw what she thought were romantic communications between Cruz and his ex-girlfriend, she ended the relationship. A day or two later, Cruz contacted Doe and told her that he had broken up with his ex-girlfriend. Doe also confirmed this with Cruz's mother. Doe and Cruz then resumed their romantic relationship.

In mid-January, however, the relationship took a turn for the worse. Cruz suddenly began insulting Doe and demanding to read her cellphone messages. On one occasion, Cruz wanted to see Doe's text messages. He took Doe's phone and scrolled through her old messages, saying that he wanted to review all of them. When Doe asked for her phone back, Cruz refused to return it to her. Doe tried to take the phone, but Cruz grabbed her wrist and twisted her arm. Doe told Cruz that he was hurting her. She repeated herself two or three times before Cruz stopped twisting her arm. Cruz told Doe that he had hurt her because she provoked him. He then returned her phone. Doe broke up with Cruz a second time, telling him that she did not want anything to do with him because he was "very violent."

A few days later, Cruz again tried to convince Doe to get back together with him, calling her on the phone, sending her text messages, and showing up at her work, sometimes unexpectedly. Doe was afraid of Cruz but resumed her relationship with him because she wanted to avoid problems.

Cruz began regularly insulting Doe, calling her a "fucking slut," "asshole," and "dumbass."

In mid-February, Cruz again took Doe's phone away from her, this time pulling it out of her purse. Cruz repeatedly accused Doe of cheating on him and told her that he did not trust her, and that he wanted to see her phone to make sure that she was not seeing anyone else. Doe complied and unlocked her cellphone for Cruz to avoid him becoming violent. When Cruz started listening to audio that Doe had sent to her daughter, Doe told him that was enough and tried to take her phone back. Again, Cruz grabbed and twisted her arm. Doe told him that she was in pain. Doe again broke up with Cruz.

Cruz continued to send Doe text messages for four or five days after Doe ended their romantic relationship. He told Doe "that [she] didn't love him much and that if [she] didn't get back with him, then [she] would get to know him." Doe perceived this to be a threat. She was afraid of going to the police because she had been working illegally and believed that she would face potential immigration consequences.

Because Cruz would not stop contacting her, and she was afraid to go to the police, Doe again agreed to continue seeing Cruz. Cruz began demanding that Doe send him her location and pictures to prove where she was. Every time Doe received a text message or phone call, she had to show it to Cruz. Doe complied with Cruz's requests to placate him and tried to manage the relationship by spending time with Cruz at his mother's house, as he seemed less prone to aggression there. Doe also tried to persuade Cruz not to show up at her work. Since Cruz had told her that "he had a ticket" and the police were looking for him, Doe tried to convince him to stay away from her work by telling him that the police go by her work often. Cruz stopped showing up at Doe's work for some time after that.

4

On March 1, at around 1:45 p.m., Doe was going out to eat with her aunts. Doe had sent Cruz a picture of herself with her aunts when she arrived at the restaurant and told him that they were going to eat. Cruz began calling Doe and sending her insulting text messages. Doe had missed calls, video calls, and text messages from Cruz. Cruz deleted some of his messages, but the messages that remained said, "You'll see," "Fucking idiot," "Slut," and "I don't want to have anything to do with you." Doe responded, "Come on. What's wrong with you?" and said that she was answering his phone calls and messages.

Doe told Cruz that she was accepting his offer to break up and that she did not want to get back together. Cruz responded that he was going to go looking for Doe at her work and that she should leave her car unlocked so that he could wait for her in her car. In the past, Doe would leave her car open for Cruz about twice a week because it was usually very cold at night when she got off work, and Cruz would be waiting for her outside. Doe replied, "No." Cruz said that he was going to go anyway and that if she "wanted to make him suffer, that was fine." Doe stopped talking to Cruz and went to work. She worked from 5:00 p.m. until 1:00 a.m. that day. At around 1:00 a.m., Doe left work alone and walked to her car in the parking lot. Cruz was waiting for her outside of her car, standing on the driver's side. Cruz told Doe that it was very cold outside. Doe offered to take him home, telling him that she did not want to leave him there because she was not a bad person. However, Doe reiterated that their romantic relationship was over.

Doe thought that giving Cruz a ride home would help to appease him and keep him from becoming violent. Cruz's home in Desert Hot Springs was about 25 minutes away from the bakery in Palm Springs. During the car ride, Doe reiterated to Cruz that she did not want to continue their romantic

5

relationship and that the relationship was over. Cruz tried to convince her that "all couples . . . have problems." Doe told Cruz that she was afraid of him, to which he replied that there was no reason for her fear "because he had never hit a woman."

When they arrived at Cruz's house, Doe asked him to get out of the car. Cruz refused and insisted that Doe always ended up getting back together with him so there was no reason to prolong the breakup. Doe maintained that she did not want to get back together. Cruz said that he would agree and "stop looking for [Doe]" under one condition, which was that she have sex with him. He promised that if she had sex with him one last time, he would get out of the car and would stop calling her, texting her, and showing up at her work. Doe told Cruz that she did not want to have sex with him. The discussion between Cruz and Doe lasted until 4:00 a.m.

Doe eventually agreed to have sex with Cruz to get him to leave and in exchange for his promises to leave her alone afterwards. After they had sex, however, Cruz still refused to leave the car. He told Doe that he was not going to leave her alone. Doe asked Cruz to let her go and told him that her aunts were going to get worried and start calling her, which would cause problems. Cruz got out of the car but left the passenger door open and walked around the car, saying he needed to check the trunk. He opened the trunk and looked inside. Cruz then stood inside the open passenger door, refusing to move. Doe began to drive away slowly, and after she had driven far enough, she reached over and closed the passenger door. She saw that Cruz was still standing outside of his house, looking at her.

Later that day, on March 2, Doe was scheduled to work from 5:00 p.m. to 1:00 a.m. again. Cruz texted Doe throughout the day, telling her that she did not love him enough and that he was going to fight for the relationship.

6

Doe told Cruz that she was going to go to the police because he was harassing her and ignoring her repeated requests to stop contacting her. When Doe got to work around 5:00 p.m., she texted Cruz that she was not going to leave her car unlocked for him and to stop following her. Cruz responded that he did not care if Doe "would make him suffer." Doe took that to mean that Cruz would not be coming to her work that day.

Doe took a break from work at about 10:30 p.m. and checked her messages. She did not have any messages from Cruz. She was supposed to end her shift at 1:00 a.m. again, but she had a large order and ended up getting out of work at about 4:00 a.m. She was the only person at the bakery that night. She left work and walked to her car. As she was walking toward her car, she saw that someone who had been sitting on the edge of the parking lot was coming toward her. She recognized that it was Cruz when he came closer to her. Doe continued to walk toward her car. Cruz started asking "what the fuck was [Doe] doing" and why it had taken such a long time for her to come out of work. Doe told Cruz that she was very tired after work, just wanted to go home, and they could talk later. Cruz asked Doe whether she had been drinking. When Doe got in her car to drive, Cruz opened the passenger door and got in the car, too. He told Doe that he was on drugs and that it was her fault because he needed to take drugs to cope with the breakup. Doe told him it was not her fault, and she did not want to be with him. He replied, "Well, you already made me angry. Start the car." Doe picked up her purse and tried to get out of the car, but Cruz grabbed her by her hair and jacket. Doe told him that if he did not let her go, she would scream. When he did not let her go, Doe yelled out for help. Cruz told her to shut up and grabbed her by her hair and her face. He pulled her back into the driver's seat and would not let go. Doe screamed again, and Cruz

7

grabbed her by the mouth and pulled her onto the center console. Cruz was on top of Doe, covering and grabbing at her mouth. He told Doe to shut up because he did not want to go to jail. Doe's eyes were closed and she could taste blood in her mouth. Cruz told her, "If you don't calm down, things are going to be worse for you." Doe nodded and said she would calm down. Cruz let her go but took the car keys from her. He then grabbed Doe by her clothes to move her to the passenger side. Doe told him that he could just take the car if he wanted to.

Doe saw someone approaching the car after she screamed for help, but Cruz told the approaching person that everything was fine. Cruz closed the driver's side door and started driving Doe's car. Doe was crying. As he was driving, Cruz told Doe, "You make me get angry," and again told her, "Shut up, or things will be worse for you." Cruz told her not to do or say anything and that if she did, he was going to report her to immigration.

Cruz drove to his sister's house and parked outside. He said that he "had been a little rough" with Doe. Doe tried to appease Cruz by apologizing and telling him that he was right and that she had made a mistake. Doe believed that things would get worse for her if she tried to get out of the car and that Cruz could kill her. Cruz made Doe promise on her daughter's life that she would not tell the police about what happened. Doe agreed. Doe told Cruz that she needed to go home and that her family would start getting worried if they did not see her at home soon.

Cruz drove away from his sister's house toward a store, where he parked the car and stepped out. He instructed Doe not to get out of the car. Instead, he walked around to her side and pulled her out and looked for something in the car. He then took Doe over to the driver's side and told her

that she had blood on her mouth. He tried to come closer to wipe the blood, but Doe said, "No." Doe got in the car and drove home.

When Doe got home at about 6:00 a.m., she told her aunt what had happened. Her aunt told her that if she did not want any more problems, Doe should think about going back to Mexico. Doe believed that her problems would not be over if she went back to Mexico because in December 2019, she saw Cruz's text messages to his ex-girlfriend on his phone, in which he threated to go find her in Mexicali. She decided to report Cruz to the police. Doe felt like she was betraying Cruz, which she expressed to the interviewing officer.

The forensic nurse who evaluated Doe found bruising inside the mouth. There were injuries and scrapes along the side of her mouth and chin, as well as marks all along Doe's neck and near her ear, and dried blood inside her ear. When the nurse checked Doe's hands for signs of offensive or defensive injuries, she found that one of Doe's fingers was swollen and painful. Doe had difficulty bending it. Doe complained of head and neck pain. She also reported a lot of pain in her mid-back area and the nurse observed redness in a line across her back, as well as red marks on the back of Doe's left arm and her scalp.

While Doe was in the forensic exam, Cruz began texting and calling her. Cruz sent numerous text messages, asking her whether she was okay, why her phone was on silent, said that he was going to come over to her house "right now," and asked her to send him screenshots of her text messages with coworkers to explain why she was taking so long to respond to him. Doe showed the reporting officer her phone, who observed that Cruz sent Doe at least 26 messages and called her about seven times in that period.

9

The police obtained an emergency protective order for Doe and went to Cruz's mother's house to find Cruz. Cruz was walking down the street when the police apprehended him. When asked what his name was, Cruz provided a fake name. When a detective told him that he was under arrest, Cruz replied, "I don't give a fuck. I'll be out in ten days."

Doe was not Cruz's first victim. Indeed, Cruz stipulated that he had been convicted of stalking with an active restraining order, vandalism, three counts of violating a restraining order within seven years of an act of violence or credible threat of violence, and two counts of criminal threats against a prior girlfriend, Jane Roe.

At Cruz's trial, Roe testified that she was in a relationship with Cruz in 2016 and that they dated for close to two years. She recalled that before she ended the relationship for good, she and Cruz went "back and forth" several times, breaking up and getting back together. When they broke up, Cruz became angry, calling Roe and sending her a lot of text messages.

Eventually, Roe got a restraining order protecting her from Cruz. Despite the restraining order, Cruz called Roe using several different phone numbers at her home, where she was living with her father. Cruz talked to her about getting back together. When she made it clear that she did not want to get back together, he became upset and sent her multiple text messages and emails. In the messages, Cruz said that if they did not get back together, he would go to Roe's work and beat her up and cut off her ear.

A couple of months later, Cruz accused Roe of cheating on him with his uncle. Cruz showed up at Roe's work, grabbed rocks from across the street, and broke the windows on her car while she was working at Home Depot. Cruz sent her a picture of her car with the broken windows and apologized, saying he was sorry and asking her to marry him. He also said that he was

"going to make [her] life a living hell," and that he was going to cut her ear off so that she would "remember him [her] whole life." Cruz attached a photo of a severed ear. Cruz further told Roe that she had to go to his house and have sex with him, or else he would go and look for her and she "was going to regret it." When Roe started seeing someone else, Cruz told her that she and her boyfriend "better watch [their] back[s]." Cruz called her a slut and again asked her to have sex with him, threatening to "shut her eyes" by punching her. Roe believed that Cruz did not care about the restraining order, which "was nothing to him."

Defense

Cruz testified in his own defense. He stated that he moved to California from Arizona in 2015 after he was released from prison there. In 2019, he started working for the landscaping company where he met Doe. He "fell in love with [Doe] since the very first day [he] saw her." Cruz and Doe quickly developed a dating and sexual relationship.

Although Doe was living with her aunt, Cruz did not meet her aunt because a coworker from the landscaping company had communicated to Doe's aunt that Cruz was a bad person and had been in prison for drugs. Cruz told Doe that this was a lie and that he had gone to prison in 2016 "[b]ecause at that time, [Roe, his ex-girlfriend] had cheated on me. And I had gone over to her uncle's house, and I broke some windows." When Doe said that she did not believe Cruz, Cruz took Doe to his mother's house, where his mother corroborated his story.

At the end of December, Cruz had been talking to a female friend from Mexico. One day, when Doe and Cruz were at Cruz's sister's house, Cruz left his cellphone with Doe. Doe saw his messages and thought that he was dating the other woman. Doe was "mad at [Cruz]" during that time. Cruz

11

showed up at Doe's work, hoping to talk to her about their relationship and to ask her for forgiveness. Cruz typically would take the bus to Doe's workplace and arrive at around 11:00 p.m. He would then wait for Doe until she got out of work. Cruz knew that the times Doe got off work varied between 1:00 a.m. and 4:00 a.m. Sometimes, Doe would leave her car open for Cruz so that he could wait for her to get off work in the car. When Doe got off work, she would usually drop Cruz off at his mother's house or sister's house.

At the end of December, Cruz and Doe made up and continued to date. In January 2020, Doe drove Cruz to his sister's house after she got off work, as usual. Cruz asked to see her cellphone. He told her that he wanted to see it because she did not respect his phone privacy. He grabbed her phone and told her to unlock it with her fingerprint. Doe grabbed her cellphone, pulling it toward herself and away from Cruz. Cruz thought that Doe must be trying to hide something from him. Cruz grabbed Doe by her wrist and pulled her toward him by her hand. He said, "Give me your cellphone." Doe refused, and the two argued for about 30 seconds before Doe gave Cruz the phone. She told Cruz that he had hurt her, and he apologized.

Cruz made Doe put in her passcode to unlock her phone. He then opened her WhatsApp messages and scrolled through her conversations until he found one with a nude picture of Doe's ex-boyfriend. Doe grabbed her phone and told Cruz that the messages were with her ex-boyfriend, but Cruz insisted they were recent. Cruz grabbed Doe's wrist in the same way as before, taking her phone back from her. He then gave her phone back and instructed her to erase all of her messages. Doe complied. Cruz told Doe that he did not want anything to do with her. He testified that he wanted to retaliate by breaking up with her. She told him that she loved him and wanted to be with him, but Cruz told her to leave. Doe went home. The next

12

day, the pair met at Cruz's mother's house and made up. Cruz testified that he and Doe had sex that day but because they were "upset at each other," they had sex without kissing, holding hands, or talking.

On March 1, Cruz arrived at Doe's work at around 11:00 p.m. and waited for Doe outside of her car, by the driver's side. According to Cruz, Doe did not finish her shift and leave work until about 3:00 a.m. Doe got into her car and asked Cruz where he wanted to go. He said he wanted to go to his mother's house, and Doe said that was fine and to get in. She said that she wanted to have a serious conversation with him. She told him that she wanted to break up because Cruz was going to "find someone else" when she went to Mexico and that Cruz was just using her. Cruz told Doe that he was going to stay with her and marry her.

When they arrived at Cruz's mother's house, Cruz started crying because Doe wanted to break up with him. He asked Doe to have sex with him "for the last time." Doe asked him, "If I make love to you for the last time, are you going to stop looking for me?" and "If I give you sex, will you leave me alone?" Cruz asked if that was what Doe wanted, to which she did not respond. Instead, Doe said, "Making love, no. Sex, yes." After sex, Doe told Cruz that she likes to hurt him to see if he really loves her.

The next morning, on March 2, Cruz sent Doe text messages and images of hearts and quotes about fighting for relationships. Doe replied, telling Cruz that he was selfish and immature. Cruz "told her that she was going to eat those words one day." Doe told Cruz, "You said that you were going to get on with your life and that you weren't going to be part of mine." Cruz told her that he was going to "fight for her," but Doe told him that she did not want him to fight for her and that she just wanted him out of her life. She told him to stop looking for her. Doe also said that she was going to

13

report him to the police for harassment and that it "is harassment when the other person no longer wants it."

Cruz called Doe several times, but she did not respond. Doe went to have lunch with her aunts that day and put her phone on silent because one of her aunts does not like Cruz. Cruz told Doe that he did not want anything to do with her and called her names because he was upset. After realizing that the conflict was his fault, Cruz sent text messages to Doe depicting flowers and teddy bears. He decided to go to Doe's work to ask for forgiveness. He told Doe his plan, but Doe told him that she did not want to see him. Cruz told her that "even though [you're] mad at me . . . I'm still going to go to [your] job." He asked Doe to leave her car doors unlocked. Doe said no and that she did not want to see Cruz.

Doe was starting work that day at 5:00 p.m. Cruz took the bus there, arriving about a half hour later. He had planned to arrive at 4:30 p.m. or so to talk to Doe at the start of her shift but arrived late. Cruz decided to wait for Doe to finish work. He walked to a nearby restaurant to eat and then to a nearby park to wait for her. Cruz sent text messages to Doe at midnight because Doe usually takes her lunch at 1:00 a.m. Doe did not respond. Eventually, Doe read his message stating that he was outside of her work and again replied that she did not want to see him. Cruz still waited outside for Doe for almost 12 hours.

When Doe got off work at around 4:00 a.m., she walked to her car and put her keys in the ignition. Cruz approached her when she was already sitting in the car and asked her why she got out of work so late. Doe told him that she was making cookies. Cruz asked Doe if she had been drinking because she looked dizzy and drunk. Doe agreed to take Cruz to his sister's house. When he got in the car, he continued to ask whether Doe was drunk.

14

She replied that he was the one who appeared to be drunk, to which Cruz sarcastically replied that he was on drugs.[3] Cruz put his hands on Doe's cheeks and tried to kiss her, but Doe started yelling. Cruz got scared because there was a warrant for his arrest. He tried to calm her down by grabbing her by the hair and holding her for a couple of seconds. Cruz had his hands on Doe's face. She stopped screaming and told him that someone was coming. Cruz looked up and saw a man outside of the car. The man asked if everything was okay. Cruz gave him a "thumbs up" and said that everything was fine. Cruz covered Doe's mouth with his hand. He told her, "If you continue yelling, things are going to get worse. Because you know very well that someone's going to hear you. They're going to call the police. And I have a warrant for my arrest. And they're going to take me to jail." Cruz reiterated that he told Doe that things were going to get worse if she continued to scream because there was a warrant for his arrest and someone might call the police if they heard Doe screaming. Doe said that she understood and wanted to leave. Cruz asked whether she wanted him to drive. She agreed to let him drive, and they switched seats.

Cruz told Doe to calm down and that he loved her as he started driving. Doe said nothing. Cruz drove to his sister's house, where he parked the car outside and talked to Doe. Although they had just arrived at his sister's house, Cruz asked if he could take the car to a nearby store. Doe told Cruz that he needed to handle his own problems. Cruz drove to the store and asked Doe to promise that she would wait for him. Doe promised on her daughter's life that she would. Cruz got out of the car, and Doe left.

---

[3]     At trial, Cruz testified that he was not actually under the influence of drugs at the time.

Cruz also addressed his previous relationship with Roe. He admitted that Roe obtained a restraining order against him. He believed that Roe's father was the one who pushed for the restraining order because he wanted Roe to reconcile with her husband, who had been deported and was living in Mexicali. Cruz admitted to breaking Roe's car windows while she was at work because he believed that Roe was having an affair with his uncle. Cruz went across the street from Roe's work, grabbed two rocks, and returned to Roe's car. He threw the rocks through the front of the windshield, the back driver's side window, and the back windshield. After breaking Roe's car windows, Cruz told her friends that he was going to go to her work to look for her and if she was not there, that he would go to her house.

Cruz admitted that at some point, there were three restraining orders in place protecting Roe from him. Nevertheless, he sent messages to Roe that said, "I'm going to make your life a living hell you fucking bitch," "You'll see what is coming your way you fucking bitch," and "I am going to cut your ear so you can remember me your whole life. And if you leave, you will have your fucking father here." Cruz sent other threatening messages to Roe despite the restraining orders, telling her, "I'm going to give you a good beating one day when you get off work," "I'm going to close your eyes with pure punches just so you know what you're expecting, bitch," and "Hope to God that you don't get me in a bad mood because you will regret everything."

Cruz also told Roe that she had better stop seeing her boyfriend, called her a slut, and asked her for sex. He sent Roe a picture of a cut-off ear and told her that was what her ear would look like. He also sent one message four times, which said, "Tomorrow morning I'm going to want pussy. And if you don't come, I'll go look for you at your job to give you a good beating."

After Cruz started dating Doe, he told her that he had been in prison for going to Roe's work and breaking her car windows after he learned that she was cheating on him with his uncle. He did not tell Doe about the text messages he had sent to Roe.

At some point, Cruz's mother texted Doe to tell her that Cruz was "jealous and crazy."

## DISCUSSION

## I

## SUBSTANTIAL EVIDENCE

### A. Cruz's Contentions

Cruz argues that insufficient evidence supports his conviction for stalking with a prior offense under section 646.9, subdivision (c)(2). We disagree.

### B. Standard of Review

We review challenges to the sufficiency of the evidence for substantial evidence. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658 ["A judgment will not be reversed so long as there is substantial evidence to support a rational trier of fact's conclusion . . . ."]; see *People v. Gregerson* (2011) 202 Cal.App.4th 306, 320.) In so doing, we examine the entire record in the light most favorable to the judgment below. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.) We look for substantial evidence, which is evidence that is "reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078; *People v. Banks* (2015) 61 Cal.4th 788, 804), and we do not substitute our own factual determinations for the factfinder's. (*Koontz*, at p. 1078.) Further, " [w]e do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies

17

in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106 (*Brown*).)

## C. Analysis

Cruz challenges his conviction for stalking with a prior offense, but he admits that the evidence established he had been convicted of a prior offense. As such, Cruz focuses his argument on the elements of stalking, which are defined by section 646.9, subdivision (a) as follows:

> "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking[.]"

Cruz first contends that the prosecution failed to prove with substantial evidence that he repeatedly followed or harassed Doe with no legitimate purpose. As we discuss *post*, we conclude Cruz's arguments are without merit.

The stalking statute also defines the term "harasses." "For the purposes of this section, 'harasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) In addition, modifying the word "following" as used in the statute, the word "repeatedly" means "the perpetrator must follow the victim more than one time." (*People v. Heilman* (1994) 25 Cal.App.4th 391, 400.)

On the record before us, the evidence showed that Cruz willfully and maliciously followed and harassed Doe. By his own admissions, Cruz repeatedly called, messaged, and followed Doe despite her requests to leave

her alone. Specifically, Doe had expressed to Cruz her desire to end the relationship and to get him away from her. She told Cruz explicitly that she did not want to see him, he should not come to her work, she would not leave her car unlocked for him as she had done in the past, and she wanted nothing to do with him. Yet, despite her telling Cruz to leave her alone, Cruz would not do so. He still showed up at Doe's workplace and waited outside for nearly 12 hours, until Doe left work at 4:00 a.m., and he followed her to her car.

Cruz knew that Doe had become desperate for him to leave her alone when she dropped him off at his mother's house, told him she did not want to get back together with him, and asked him to leave. Instead, Cruz sat in the car for hours, refusing to leave and begging Doe for sex. He told Doe that he would only agree to leave the car and to stop calling, texting, and following her under one condition, which was for her to have sex with him "one last time." After repeatedly refusing Cruz's advances, Doe reluctantly agreed to have sex with him in hopes that he would fulfill his promise. But after Doe relented and had sex with Cruz, Cruz still refused to leave the car and told Doe that he had no intention of leaving her alone. After finally leaving the car, he sent multiple text messages and phone calls that same morning, and later showed up at Doe's work after she again told him to stop following her. This evidence easily satisfies the following and harassing prongs of the stalking statute. Indeed, Cruz does not dispute this evidence. Rather, he contends he had a legitimate purpose for engaging in this activity. According to him, he was just engaging in the same conduct he previously exhibited in his relationship with Doe to convince her to resume a romantic relationship with him. And, as such, substantial evidence does not support his conviction.

19

However, Cruz's argument is not of the moment. Simply characterizing his actions as a "dating tactic" does not negate any element of stalking or otherwise excuse Cruz's conduct in the instant action. In other words, Cruz may not avoid responsibility here by claiming he did it all for love. As such, we summarily reject his argument that he was legally permitted to engage in his untoward conduct as long as he was trying to reconcile with Doe.

Cruz next argues that substantial evidence does not support the jury's conclusion that he intended to place Doe in fear for her safety or the safety of her family. At trial, the prosecution emphasized two threats made by Cruz toward Doe. The first consisted of the following: "You are going to get to know the real me. You'll see." And the second was, "Shut up, or things will be worse for you. You need to calm down, or it will be worse for you." Cruz characterizes both these statements as "vague and ambiguous" and argues that the context in which the statements were made indicate that he did not intend to place Doe in fear. We disagree.

Proof that the defendant made "a credible threat" is a required element for a conviction of stalking. (*People v. Ewing* (1999) 76 Cal.App.4th 199, 210.) The stalking statute defines a "credible threat" very broadly as "a verbal or written threat . . . or a threat implied by a pattern of conduct . . . made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety . . . and made with the apparent ability to carry out the threat." (§ 646.9, subd. (g).) Moreover, "the question is not whether each individual expression communicated the requisite threat but whether the combination of all of appellant's communications, expressions and conduct did so." (*People v. Lopez* (2015) 240 Cal.App.4th 436, 449 (*Lopez*).) " ' "[T]he element of intent is rarely susceptible of direct proof and must usually be inferred from all the facts and circumstances disclosed by the evidence." ' "

20

(*Id*. at p. 454.) "It is not necessary to prove that the defendant had the intent to actually carry out the threat." (§ 646.9, subd. (g).)

The first statement that Cruz challenges, in which he told Doe that she would get to know the real him if she did not reconcile with him can reasonably be interpreted as a threat. After Cruz grabbed and twisted Doe's arm to force her to unlock her phone for him and delete all of her messages on WhatsApp, Doe broke up with Cruz. Cruz continued to send Doe text messages for four or five days and told her that "if [she] didn't get back with him, that [she] would get to know him." Further, Cruz had been sending insulting messages to Doe for some time leading up to this statement, calling her a "fucking slut," "asshole," and "dumbass." In addition, Cruz had on another occasion sent Doe a cluster of messages that said, "Fucking idiot," "Slut," and "You'll see," further supporting the interpretation that Cruz was threatening Doe when he said that she would "get to know him" if she did not get back together with him. Indeed, the most reasonable interpretation of Cruz's statement was that he was trying to scare Doe into agreeing to date him again.

Moreover, we are not persuaded by Cruz's argument that his statement was "ambiguous and equally subject to the interpretation that Cruz would go out of his way to be kinder to Doe." Such an argument, again, goes to the weight of the evidence and argues that an alternative inference is plausible under the evidence. Yet, that contention is not proper as part of a substantial evidence review of a jury verdict. (See *Brown*, *supra*, 59 Cal.4th at p. 106; *People v. Solomon* (2010) 49 Cal.4th 792, 819 (*Solomon*).)

The second statement that Cruz made to Doe to "shut up, or things will be worse for you," also was not too vague to convey Cruz's intent to cause Doe fear. Cruz admitted that he grabbed Doe by her hair and face and covered

21

her mouth with his hand. He then told her, "If you continue yelling, things are going to get worse. Because you know very well that someone's going to hear you. They're going to call the police. And I have a warrant for my arrest. And they're going to take me to jail." Also, Cruz later testified that he told Doe that things were going to get worse if she continued to scream "[b]ecause you know I have a warrant for my arrest. Someone's going to listen to you, and they're going to call the cops."

At the time Cruz made this statement to Doe, her eyes were closed, she was crying, and she could taste blood in her mouth from Cruz's assault. Further, Cruz had just waited outside of Doe's workplace for her for almost 12 hours despite Doe telling him to stay away. A concerned passerby approached the car to ask if everything was alright, but Cruz told him all was well and sent him away. Given that Cruz was physically hurting and restraining Doe while covering her mouth and instructing her not to call out for help, and that he sent away the only person who came to check if Doe was alright, an extremely reasonable interpretation is that Cruz intended to threaten Doe and put her in fear by telling her that "things will be worse" for her if she continued to scream.

Nevertheless, Cruz argues that it is unclear what he meant by "things will be worse," suggesting that he did not want the police to come because he was looking out for Doe's immigration status. Cruz was able to make this argument to the jury below, but the jury did not believe him. Even if we found Cruz's argument persuasive (which we do not), we may not substitute our opinion of the facts for that of the jury. (Cf. *Solomon*, *supra*, 49 Cal.4th at p. 819.)

In addition, Cruz's claim that the People only provided two instances of credible threats ignores that the law authorizes the jury to consider Cruz's

statements as part of a general pattern of conduct and within the totality of the circumstances. (*Lopez, supra*, 240 Cal.App.4th at p. 454.) In *Lopez*, the court found that the defendant intended to cause the victim fear when he continued to contact her despite her requests to stop: "Appellant not only ignored [the victim's] increasingly impassioned pleas to stop contacting her because he was scaring her, he responded with further contacts . . . . There can be no question appellant knew he was causing [her] fear . . . [she] told him in September that she had contacted the police because he was frightening and scaring her . . . . Appellant maintains that . . . he had no *intent* to instill fear in [her], that he only wanted to reconcile with her. But his persistence in the face of [her] efforts to avoid him . . . amply supports the inference that he intended the result he caused." (*Lopez, supra*, 240 Cal.App.4th at p. 454.)

Here, similar to the appellant in *Lopez*, Cruz ignored Doe's many pleas to stop contacting her, and instead responded with further contacts. Between January 3, 2020 and March 3, 2020, there were 700 pages of text messages between Doe and Cruz. Doe repeatedly told Cruz that she did not want anything to do with him because he was "very violent," that she did not want to get back together with him, and that she did not want Cruz to come to her workplace. Similar to *Lopez*, Cruz knew that Doe was afraid of him because she had told him so. And Doe told Cruz that she was going to report him to the police for harassing her and ignoring her requests to stop contacting her. Also, as in *Lopez*, Cruz argues here that he never meant to instill fear in Doe but that he only wanted to reconcile with her. (*Lopez, supra*, 240 Cal.App.4th at p. 454.) As the court found in *Lopez*, Cruz's "persistence in the face of [Doe's] efforts to avoid him . . . amply supports the inference that he intended the result he caused." (*Ibid*; see *People v. Falck* (1997) 52 Cal.App.4th 287,

299 ["[I]t can be inferred that appellant intended to cause fear in the victim from the fact that he insisted on maintaining contact with her although she clearly was attempting to avoid him . . . ."].)

Cruz's case also is similar to *People v. Uecker* (2009) 172 Cal.App.4th 583 (*Uecker*), wherein the defendant often sat next to the victim's car in her work parking lot when she would go to lunch, even when her lunch hour varied. (*Id*. at p. 588.) The court found that there was substantial evidence to support that the defendant made a credible threat and intended to place the victim in reasonable fear for her safety, as "a reasonable jury could conclude defendant wanted [the victim] to know he had been watching her while she was parked at work and keeping track of her schedule to place her in fear of her safety." (*Id*. at p. 595.)

Other cases have similarly found a defendant's positioning himself to watch the victim's comings and goings as evidence of the defendant's intent to place the victim in fear. (See, e.g., *Lopez*, *supra*, 240 Cal.App.4th at p. 452; *People v. Halgren* (1996) 52 Cal.App.4th 1223, 1233.) Here, Cruz repeatedly came to Doe's workplace and sat outside for hours, waiting for her by her car in the middle of the night, despite her numerous requests to stop. Cruz also wanted Doe to know that he was watching her and keeping track of her schedule by requiring her to show him screenshots of her conversations with coworkers, her location anytime she went anywhere, and all of her phone calls and text messages. (See *Uecker*, *supra*, 172 Cal.App.4th at p. 595.)

Based on the totality of the circumstances and the context surrounding Cruz's statements to Doe, a reasonable jury could find beyond a reasonable doubt that Cruz's conduct posed a credible threat to Doe and that Cruz intended to put Doe in fear for her safety. Cruz's interpretation of the evidence may not be substituted for the jury's reasonable interpretation that

24

he intended to scare Doe when he told her that she would "get to know the real him" if she did not get back together with him, when he told her to "shut up or things will get worse" as he held her down by her hair with his hand over her mouth, and when he sent harassing messages and appeared at her workplace on multiple occasions after she told him that he was scaring her and demanded that he stop following her. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Finally, Cruz argues that substantial evidence does not show that Doe was in reasonable fear for her safety. We reject this contention.

The parties agree that a defendant's past acts of violence or threats can aid in the determination of whether a victim's fear is reasonable. (See *People v. McClelland* (1996) 42 Cal.App.4th 144, 154.) Here, substantial evidence established Cruz's prior acts of violence and stalking not only regarding Doe but also Roe, some of which was personally known to Doe and would support her reasonable fear of Cruz. Cruz testified that Doe's aunt knew about his criminal history and had communicated to Doe that Cruz was a bad person and had been in prison for drugs. Cruz told Doe that he had been in prison in 2016 "[b]ecause at that time, [Roe] had cheated on me. And I had gone over to her uncle's house, and I broke some windows." When Doe said that she did not believe Cruz, Cruz took Doe to his mother's house, where his mother confirmed Cruz's story. Later, Doe saw Cruz's text messages to Roe on his cellphone, in which he threatened to go find her in Mexicali. Doe also knew that Cruz was out on parole and that the police had a warrant for his arrest.

Moreover, Cruz's mother sent text messages to Doe telling her that Cruz was "jealous and crazy." Like he did with Roe, Cruz repeatedly accused Doe of cheating on him and told her that he did not trust her. Based on what

25

Doe knew about Cruz, as well as her experiences with him, it would have been reasonable for Doe to fear that Cruz would be aggressive toward her.

Additionally, Cruz previously acted violently toward Doe when he grabbed her arm and twisted it twice to get her cellphone. Doe told Cruz that he had hurt her and that she was afraid of him.

Cruz's statement to Doe to "shut up, or things will get worse" also was immediately preceded by violence. After Cruz grabbed Doe by her hair and head and covered her mouth, he pulled her inside the car to the point that Doe had blood inside and around her mouth and in her ear, as well as injuries on her neck, head, chin, arm, and back. When Doe screamed for help, someone came over to the car, but Cruz sent them away. Cruz's violence toward Doe provide an impetus to her reasonable fear that Cruz could and would harm her even more than he already had.

Further, the evidence paints a picture of a dangerous situation that was exacerbating because of Cruz's behavior and actions. Although Doe told Cruz to stay away, he knew where she worked and showed up, waiting for her. In addition, Cruz became increasingly controlling and surveilled Doe's every move, requiring her to show him all of her text messages, to delete her conversations when he instructed her to do so, to send him her location and pictures proving where she was, and to show him every text message or phone call she received.

Also, Cruz showed no signs that he was going to cease his behavior, even when Doe behaved how Cruz demanded. For example, Cruz promised Doe that he would leave her alone if she agreed to have sex with him "one last time," only to continue contacting her incessantly afterwards.

Despite the evidence proffered at trial, Cruz nonetheless claims that Doe's fear for her safety was unreasonable because "[h]er safety was never

26

threatened by any of these innocuous statements and there was no allegation that Cruz ever made any threats against Doe's family." He argues that Doe only knew about an altercation with his ex-girlfriend, but that this was not enough to make her fear reasonable. Yet, even if we were not to consider the evidence regarding Cruz's treatment of Roe, Doe had reason to fear Cruz because he had been violent with her in the past and Cruz's mother warned Doe that Cruz was "jealous and crazy," Cruz refused to stay away from her despite her many requests, and Cruz's aggressive conduct was escalating.

Simply put, substantial evidence supports the jury's finding that Doe reasonably feared for her safety. Moreover, the evidence also amply proved that Cruz's conduct was seriously alarming and annoying to Doe. Doe told Cruz that she was afraid of him after he grabbed and twisted her arm, that she did not want Cruz to "fight for her" as he insisted he would do, and that she was going to report him to the police for harassing her. As discussed *ante*, Doe also told Cruz repeatedly to stop following her, to stop contacting her and showing up at her workplace, and that she did not want to see Cruz anymore or to continue their relationship. No matter what Doe said or did, Cruz persisted. Cruz's relentless pursuit and lack of any respect for Doe's clearly-stated boundaries also supports a finding that Doe feared for her safety. (See *People v. Tran* (1996) 47 Cal.App.4th 253, 260 [conduct that seriously annoys a person and causes substantial emotional distress is harassment for purposes of section 646.9].) And Cruz knew that Doe was afraid to call the police because of her immigration status, which he used against her when he expressly threatened to report her to immigration authorities if she called the police on him. Any reasonable person in Doe's position would be alarmed and emotionally distressed by such a predicament,

and Doe testified consistently that she was afraid to report Cruz's abusive behavior for this very reason.

Based on the foregoing, we determine that substantial evidence clearly supports Cruz's conviction for stalking.

## II

## EVIDENCE RELATING TO ROE

### A. Cruz's Contentions

Cruz maintains the trial court erred in admitting Roe's testimony concerning Cruz's criminal threats under Evidence Code section 1109 to show Cruz's propensity to commit domestic violence. In the alternative, he asserts the subject evidence should have been excluded on Evidence Code section 352. We reject these two contentions.

### B. Background

In a motion in limine, the prosecution moved to introduce evidence of Cruz's acts of domestic violence against Roe, seeking to admit Cruz's prior convictions for stalking, vandalism, two counts of criminal threats, and three counts of violating a restraining order with a threat of violence or a prior. The prosecution argued that such evidence was admissible under Evidence Code section 1109 and could be used to impeach Cruz. Cruz's prior convictions arose from several acts: Cruz (1) repeatedly called Roe and her father at home from unrecognizable phone numbers; (2) sent numerous emails using different names to Roe; (3) messaged Roe via Facebook despite a restraining order, threatening to cut off her ear, punch her eyes shut, and beat her up at work, as well as calling her a slut and warning her that she would "regret everything" if she did not stop seeing her new boyfriend; (4) sent Roe pictures of her car, which he had vandalized, apologizing for the damage and asking Roe to marry him and telling her that he was going to

28

come to her work and home to find her; (5) called Roe at home and demanded that she meet with him and when she refused, became angry and threatened to "beat the crap out of her until she bleeds"; and (6) continued to send numerous text messages to Roe in violation of a protective order.

The prosecution sought to admit Cruz's convictions and Roe's testimony as to these acts under Evidence Code section 1109, arguing that Cruz's prior offenses and underlying conduct would show propensity for similar conduct in this case. The prosecution noted the similarities between Cruz's harassment of Roe and Doe whenever the women expressed that they wanted to end their respective relationships with him. The prosecution asserted that evidence of Cruz's stalking and criminal threats, in particular, was admissible because the convictions were less than 10 years old and the underlying acts did not involve any facts or circumstances that would make them unduly prejudicial.

Cruz's trial counsel opposed the prosecution's motion in part, agreeing that most of the evidence was admissible under Evidence Code section 1109 but arguing that some of the evidence underlying the prior conviction should be excluded or at least sanitized because it was unduly prejudicial to Cruz. Specifically, defense counsel sought to exclude evidence of criminal threats against Roe because Cruz was not charged with criminal threats in the current case, and Cruz's threats against Roe were severe in nature. Counsel suggested that the jury be told that, after a protective order was entered, Cruz contacted Roe numerous times over text and Facebook Messenger messages that could be characterized as "disturbing." Yet, defense counsel maintained that the specific language of the messages should not be provided to the jury.

The trial court determined that Roe's testimony was admissible regarding Cruz's criminal threats, explaining:

"[W]ith regard to Jane [Roe], they were threats of physical harm. In the present case, Jane Doe . . . will be discussing the fact that [Cruz] did, in fact, physically harm her. [¶] So I don't see it as being more inflammatory. And I think it has some substantial relevance that he is making threats to carry out acts of physical harm in the previous case, which gives some circumstantial evidence of, in the present case, that he did, in fact, commit an act of physical harm against Jane Doe . . . . [¶] . . . On balance . . . I do not feel that it is more prejudicial than it is probative."

Cruz's trial counsel renewed his objection at trial and asked the court for "clarification as to what can be discussed in [Evidence Code section] 1109." He moved to exclude testimony from Roe explaining why she received a restraining order against Cruz in his prior case. To this end, defense counsel sought to exclude that one of the reasons for the restraining order was that Cruz had tried to rape Roe and that he made a gang related reference to a Mexican cartel, which Roe perceived as a threat. Additionally, there was evidence that Cruz sent Roe a message saying, "Tomorrow morning, I'm going to want pussy. And if you don't come, I'll look for you at your job to give you a good beating," which Cruz repeated four times. Defense counsel argued that these particular messages would be highly inflammatory because they suggest that Roe was raped.

In response, the prosecution stipulated to excluding the evidence relating to Cruz's alleged ties to Mexican cartels or gangs but sought to include the other text messages from Cruz. The trial court excluded any reference to the Mexican drug cartel but allowed the threatening text messages to be admitted pursuant to Evidence Code section 1109, reasoning that the facts were similar to Cruz's demands for sex in the current case. The court explained that Evidence Code section "1109 does allow in prior acts of a similar nature. This is somewhat similar from the perspective of 'I want sex.

30

If you don't give it to me, here's what I'm going to do as a consequence.'  So there's a similarity.  And for purposes of what [Evidence Code section] 1109 allows it in for, I believe it is probative.  But the court's prior ruling stands."

Accordingly, the trial court admitted Roe's testimony, concluding that it was admissible under Evidence Code section 1109 and should not be excluded under Evidence Code section 352.  In addition, relating to this evidence, the court provided the jury with CALCRIM No. 852, which provides in relevant part:

> "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically the testimony of . . . Doe . . ., that on two prior occasions the defendant twisted her wrist and the testimony of . . . [Roe] . . .
>
> "Domestic violence means abuse committed against an adult who is a spouse, or former spouse, or cohabitant, or former cohabitant, or person with whom the defendant has had a child, or person who dated or is dating the defendant, or a person who was or is engaged to the defendant.
>
> "Abuse means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.
>
> [¶] . . . [¶]
>
> "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant did in fact commit[ ] the uncharged domestic violence. . . .
>
> "If the People have not met this burden of proof, you must disregard this evidence entirely.
>
> "If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was

disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely and did commit the offense alleged in Counts 1, 2, and 3, as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Count 1, 2, or 3. The People must still prove each charge beyond a reasonable doubt.

"Do not consider this evidence for any other purpose except for the limited purpose of defendant's predisposition."

## C. Analysis

Cruz first argues that the court's admission of Roe's testimony as well as instructing the jury with CALCRIM No. 852 was erroneous and prejudicial to Cruz. Specifically, he insists that a portion of Roe's testimony was not admissible under Evidence Code section 1109 to prove his propensity to engage in stalking because we determined some 17 years ago that stalking was not a crime of domestic violence. (See *People v. Zavala* (2005) 130 Cal.App.4th 758, 770-771 (*Zavala*).) Cruz's reliance on *Zavala* is misplaced.

Under Evidence Code section 1101, subdivision (a), evidence of a person's prior conduct is generally inadmissible to prove the person's conduct on a specified occasion. (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.) However, Evidence Code section 1109, subdivision (a)(1), provides that (except in situations not relevant here) "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

This statute permits the admission of a defendant's other acts of domestic violence to show a propensity to commit such acts. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.) It is based upon a legislative

32

determination that "policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence." (*People v. Johnson* (2000) 77 Cal.App.4th 410, 420.)

Evidence Code section 1109 applies only "in a criminal action in which the defendant is accused of an offense involving domestic violence." (Evid. Code, § 1109, subd. (a)(1); see *People v. James* (2010) 191 Cal.App.4th 478, 482.)

"Domestic violence," as used in Evidence Code section 1109, is now defined by reference to two different statutes. Originally, the phrase was defined as having "the meaning set forth in Section 13700 of the Penal Code." (Former Evid. Code, § 1109, subd. (d)(3); see Stats. 1998, ch. 707, § 1, p. 4707; *People v. Dallas* (2008) 165 Cal.App.4th 940, 954 (*Dallas*).) Section 13700 of the Penal Code defines "domestic violence" to include "abuse committed against" a "cohabitant, former cohabitant, or person with whom the suspect . . . is having or has had a dating or engagement relationship." (§ 13700, subd. (b).) "Abuse" is defined in section 13700 as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (§ 13700, subd. (a).) Stalking is not addressed in that statute.

In 2004, the Legislature expanded the type of conduct that constitutes domestic violence under Evidence Code section 1109 by adding the second definition of domestic violence: "Subject to a hearing conducted pursuant to [Evidence Code] Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred

33

no more than five years before the charged offense." (Evid. Code, § 1109, subd. (d)(3); see Stats. 2004, ch. 823, § 6.5, p. 6294.)

Section 6211 of the Family Code provides: " 'Domestic violence' is abuse perpetrated against any of the following persons: [¶] . . . [¶] (b) A cohabitant or former cohabitant . . . . [¶] (c) A person with whom the respondent is having or has had a dating or engagement relationship." A "former cohabitant" includes children who formerly regularly resided in the household. (Fam. Code, § 6209; *Dallas*, *supra*, 165 Cal.App.4th at p. 954.) "Abuse," for purposes of this provision includes "[i]ntentionally or recklessly cause or attempt to cause bodily injury," placing "a person in reasonable apprehension of imminent serious bodily injury to that person or to another," and engaging "in any behavior that has been or could be enjoined pursuant to [Family Code] Section 6320." (Fam. Code, § 6203.) Behavior that may be enjoined under Family Code section 6320 includes "stalking," as well as attacking, threatening, battering, harassing, telephoning, and disturbing the peace of the other party. (Fam. Code, § 6320, subd. (a).)

With this background in mind, "stalking" is behavior that may be enjoined under Family Code section 6320; stalking therefore constitutes "abuse" under Family Code section 6203; abuse perpetrated against a former cohabitant or a person with whom the defendant has had a dating relationship is "domestic violence" under Family code section 6211; and domestic violence under Family Code section 6211 is domestic violence for purposes of Evidence Code section 1109. (See *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1143-1144 (*Ogle*).)

Nevertheless, Cruz argues that we must follow *Zavala*, *supra*, 130 Cal.App.4th 758, wherein we concluded that "stalking is concomitantly *not* a crime of domestic violence (as defined by section 13700) . . . ." (*Id.* at pp. 770-

34

771.) In reaching that conclusion, we only referred to the first definition of domestic violence in Evidence Code section 1109, the definition that incorporates Penal Code section 13700. Here, the People assert that we should disregard *Zavala* and rely on *Ogle, supra,* 185 Cal.App.4th 1138. According to the *Ogle* court, this court "overlook[ed]" the second definition under "Family Code section 6211, which defines domestic violence more broadly and includes stalking." (*Ogle,* at p. 1144.)

It is accurate to point out the limited approach we took to defining a crime of domestic violence. Yet, the timing of our opinion in that case explains our focused analysis. We issued the opinion in *Zavala* in June 2005, six months after the effective date of the amendment to Evidence Code section 1109 that incorporated the Family Code's definition of domestic violence. (See Cal. Const., art. 4, § 8(c)(1) [statutes generally go into effect on January 1 of the year following enactment].) Although we did not point out when the trial in *Zavala* took place, based only on the timing of the appeal, the trial almost certainly occurred before the January 2005 effective date of the amendment. The broader Family Code definition of domestic violence, therefore, was simply not incorporated into Evidence Code section 1109 at the time of trial in *Zavala* and therefore irrelevant to our consideration of the issues before us. Because we are dealing with a trial that occurred after the January 2005 amendment to Evidence Code section 1109, *Zavala* is of limited help in the instant matter. Further, stalking, under the facts here, is a crime involving domestic violence. (See *Ogle, supra,* 185 Cal.App.4th at p. 1144.) Consequently, the trial court did not abuse its discretion in admitting Roe's testimony under Evidence Code section 1109 in connection with Cruz's stalking offense.

35

Cruz next argues that, even if Roe's testimony could have been admitted under Evidence Code section 1109, the trial court nonetheless abused its discretion by admitting the evidence over his counsel's Evidence Code section 352 objection. We disagree.

Evidence that can be admitted under Evidence Code section 1109 nevertheless is generally subject to exclusion where the admission of such evidence would be more prejudicial than probative within the meaning of Evidence Code section 352. (Evid. Code, § 1109, subds. (a)(1), (e).) Under Evidence Code section 352, trial courts have "discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice." (*People v. Mendoza* (2007) 42 Cal.4th 686, 699; *People v. Carter* (2005) 36 Cal.4th 1114, 1168.) " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.' " " (*People v. Williams* (2013) 58 Cal.4th 197, 270 quoting *People v. Bolin* (1998) 18 Cal.4th 297, 320.)

"Evidence is not prejudicial, as that term is used in a[n] [Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which

uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, quoting *People v. Yu* (1983) 143 Cal.App.3d 358, 377; see *People v. Wang* (2020) 46 Cal.App.5th 1055, 1075-1076.)

" ' "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' " (*People v. Megown* (2018) 28 Cal.App.5th 157, 164, quoting *People v. Doolin* (2009) 45 Cal.4th 390, 439.)

Here, the challenged evidence was probative of Cruz's intent, the willful and malicious nature of his threats, and the reasonableness of Doe's fear. Cruz persistently contacted both women despite their requests to stop and begged them to get back together with him and have sex with him when they tried to end the relationship. He followed both of them and accused them of cheating.

Regarding his criminal threats against Roe, we conclude that Cruz's threats toward Doe and Roe were similar in nature. For example, Cruz told Roe that he would go find her in Mexicali and that if they did not get back together, he would go to Roe's work to beat her up and cut off her ear. Similarly, Cruz told Doe that if she did not get back together with him, she "would get to know him," and repeatedly threatened to show up at Doe's work and house despite her requests that he not do so.

Cruz's behavior against both victims, including his threats, showed a common pattern of domestic violence, precisely the kind of pattern that is

appropriately admitted during trial. (See *People v. Kerley* (2018) 23 Cal.App.5th 513, 535 ["[T]he Legislature concluded that, in domestic violence cases in particular, a history or pattern of domestic violence is very probative." This is because " ' "on-going violence and abuse is the norm in domestic violence cases" ' " and is typically part of a scheme that " ' "usually escalates in frequency and severity" ' "].) Further, such evidence buttressed the prosecution's theory that Cruz, in harassing and threatening Doe, had no legitimate purpose. The evidence also underscored the reasonableness of Doe's fear.

In addition, we agree with the People that the challenged evidence was not unduly prejudicial. Cruz's threats to Roe did not uniquely invoke an emotional response in the jury. Indeed, Cruz's threats were less inflammatory than his conduct toward Doe, who he physically assaulted by twisting her arm and later attacking her in her car (causing bleeding and various injuries).

Although some of Cruz's threats to Roe were more explicit than the ones he levied at Doe and therefore facially more severe, the threats were not substantially different so as to provoke an improper response by the jury. In both cases, Cruz essentially threatened to follow and harass the two women at their homes and workplaces if they did not comply with his demands to continue dating him or to have sex with him.

Additionally, Roe's testimony about Cruz's criminal threats was but a small portion of the evidence against Cruz. There also was an abundance of domestic violence acts against Roe other than the criminal threats that Cruz does not challenge. (See *People v. Valdez* (2012) 55 Cal.4th 82, 134 ["Given the extensive other evidence of defendant's [acts of the same nature], [the] defendant's claim that a handful of gang-related exhibits . . . created 'a

substantial danger of undue prejudice[,]' . . . i.e., the challenged evidence ' "uniquely tend[ed] to evoke an emotional bias against defendant as an individual" ' . . . is untenable"].)  As in *Valdez*, given all of the other admitted evidence of Cruz's more serious acts of domestic violence—including stalking both Doe and Roe, physically assaulting Doe, coercing Doe into sex, and breaking the windows on Roe's car—the suggestion that Roe's testimony about the threats Cruz made to harm her would uniquely tend to evoke an emotional bias against him is not well taken.  Further mitigating against prejudice is the fact that the jury learned that Cruz had been convicted for his prior offenses, and so would not be inclined to punish him in this case. (Cf. *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

In summary, considering the record before us, the court did not abuse its discretion in admitting the evidence of the criminal threats Cruz made against Roe.

## III

## CHANGES IN SENTENCING LAWS

### A.  Cruz's Contentions

Cruz argues that we must remand this matter to the trial court for a new sentencing hearing in light of new, intervening legislation.  Although the People agree that Assembly Bill 518 (Stats. 2021, ch. 441, § 1) and Senate Bill 567 (Stats. 2021, ch. 731, § 1.3) apply to Cruz's case because it is not yet final, they disagree that remand is required on the record before us.  Cruz has the better argument.

### B.  Analysis

Here, the trial court sentenced Cruz to the upper term of five years for count 2 (stalking with a prior conviction of the same offense) doubled to 10

years for his prior strike conviction.[4]  The court imposed a consecutive sentence for count 3 (infliction of a corporal injury on a dating partner) consisting of one-third the midterm, doubled to two years.[5]  The court imposed but stayed, under section 654, a sentence consisting of one-third the midterm for count 1 (false imprisonment), doubled to 16 months.[6]

During the sentencing hearing, the court commented that it had presided over Cruz's previous trial after which it gave Cruz a fair sentence that "was not anywhere near the max[,]" and then Cruz, once he was released from prison, "absconded from parole and then committed, essentially, some of the same type of offenses here, albeit more egregious because there was violence in the offense."  The court observed that Cruz had "some substance abuse and mental health issues" that it "should consider as mitigation."  However, the trial court found "circumstances in aggravation, as indicated in

---

[4]    The sentencing triad for stalking with a prior conviction for the same offense is two, three, or five years.  (§ 646.9, subd. (c)(2).)

[5]    The sentencing triad for infliction of corporal injury on a dating partner is two, three, or four years.  (§ 273.5, subd. (a).)

[6]    The sentencing triad for false imprisonment is 16 months, two years, or three years.  (§§ 236, 18, subd. (a).)

the probation officer's report[7] as well as those mentioned by the prosecutor here today."[8] The court determined that "the circumstances in aggravation far outweigh those in mitigation, not only in terms of the number but in quality." As such, the court indicated that the "appropriate sentence" for Cruz was the upper term of count 2 as the principal term.

## C. Analysis

At the time of sentencing, former section 654, subdivision (a) required that a defendant who committed an act punishable by two or more provisions of law be punished under the provision that provided for the longest possible term. (Stats. 1997, ch. 410, § 1.) Effective January 1, 2022, Assembly Bill 518 (2021-2022 Reg. Sess.) amended section 654, subdivision (a) to permit an act or omission punishable under two or more provisions of law to "be punished under either of such provisions." (§ 654, subd. (a); Stats. 2021,

---

7     In the probation officer's sentencing recommendation, the probation officer listed the following circumstances in aggravation: (1) the crime involved great violence; (2) the victim was particularly vulnerable; (3) the manner of the crime indicated planning, sophistication, and professionalism; (4) Cruz took advantage of a position of trust or confidence to commit the offense; (5) Cruz engaged in violent conduct that indicates a serious danger to society; (6) Cruz's prior convictions are numerous or of increasing seriousness; (7) Cruz served a prior prison term under section 1170, subdivision (h); and (8) Cruz's prior performance on parole was unsatisfactory.

8     At the sentencing hearing, the prosecutor emphasized several aggravating factors, including the victim was particularly vulnerable because she had recently moved to the United States, the manner of the crime indicated "there was investigation and professionalism[,]" Cruz took advantage of a position of trust to commit his crimes, Cruz was on parole at the time he committed his crimes, Cruz's lengthy criminal history, and his prior performance on parole.

ch. 441, § 1.)  Thus, under newly-amended section 654, a trial court now has the discretion to punish a defendant under any of the applicable laws.

Under Senate Bill 567, which became effective on January 1, 2022, the trial court must impose a term of imprisonment not exceeding the middle term unless (1) aggravating circumstances have been established by stipulation or found true beyond a reasonable doubt at trial, or (2) the defendant has suffered prior convictions as established by certified records. (§ 1170, subd. (b), as amended by Sen. Bill No. 567, Stats. 2021, ch. 731, § 1.3.)

Cruz asserts, and the People agree, Assembly Bill 518 and Senate Bill 567 apply retroactively in Cruz's case because they make ameliorative changes in the law that apply to all nonfinal convictions.  (*People v. Mendoza* (2022) 74 Cal.App.5th 843, 862, fn. 14 [Assembly Bill 518 is retroactive]; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038-1039 [Senate Bill 567 is retroactive].)  However, the parties disagree regarding whether remand is required here.

As to Senate Bill 567, the People argue that there is no need to remand for resentencing for two reasons.  First, they contend the trial court's sentencing decision complied with section 1170, subdivisions (b)(2) and (b)(3) because Cruz stipulated to his previous crimes and a certified conviction packet was offered into evidence.  Second, the People maintain that to the extent the trial court relied on aggravating factors that were not presented to the jury and found to be true beyond a reasonable doubt in violation of section 1170, subdivision (b)(2), there was no prejudice because if the correct process had been followed, the jury would have found the underlying facts to be true beyond a reasonable doubt.

Neither argument the People offer has merit under our recent decision in *People v. Lopez* (2022) 78 Cal.App.5th 459. In that case, as here, the trial court relied on numerous aggravating sentencing factors in deciding to give the defendant an upper-term sentence, at least one of which related to the defendant's record of prior convictions. (*Id.* at pp. 464, 466.) We rejected the People's suggestion that because under section 1170, subdivision (b)(3), the defendant's prior convictions did not have to be found true by a jury, there was no need to remand for resentencing. (*People v. Lopez*, at p. 466.) We explained that where a trial court "originally relied on both permissible and impermissible factors in selecting the upper term," we could not affirm the sentence unless we could "be assured that the trial court *would have exercised its discretion to impose the upper term* based on a single permissible aggravating factor . . . related to the defendant's prior convictions." (*Id.* at p. 467.) Because the record failed to provide such assurance, remand was necessary to allow the trial court to make an informed sentencing decision. (*Id.* at p. 468.)

This analysis from *People v. Lopez* applies here and leads to the same conclusion. Although the trial court relied on Cruz's criminal history in choosing to impose the upper term for count 2, it relied on a number of other aggravating factors as well. Even assuming the court properly considered Cruz's criminal history, there is no indication in the record that the court would have selected an upper term sentence if the additional aggravating factors were not present. Consequently, we cannot uphold Cruz's sentence on this ground.

In *People v. Lopez*, we also rejected the People's second argument advanced in this case—that is, the defendant could not demonstrate any error in sentencing him under the former version of Penal Code section 1170

was prejudicial, because "a jury would have found true, beyond a reasonable doubt, the aggravating factors on which the trial court relied in selecting the upper term." (*People v. Lopez, supra*, 78 Cal.App.5th at p. 465.) We agree with the People that the trial court's sentencing error should be reviewed for harmlessness under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18. Under this standard, an erroneous failure to submit a sentencing factor to the jury " ' "does not require reversal if the reviewing court determines it was harmless beyond a reasonable doubt." ' " (*People v. Lopez*, at p. 465.) " 'The failure to submit a sentencing factor to a jury may be found harmless if the evidence supporting that factor is overwhelming and uncontested, and there is no "evidence that could rationally lead to a contrary finding." ' " (*Ibid*.)

However, we disagreed in *People v. Lopez* that we could find the sentencing error to be harmless. The prosecution had not sought to prove the aggravating factors to a jury, and the defendant "had no reason to present evidence that might have contradicted evidence supporting truth of the facts underlying the aggravating factors relied on by the trial court." (*People v. Lopez, supra*, 78 Cal.App.5th at p. 466.) We therefore could not say, for every aggravating factor relied on by the trial court, that " 'the evidence supporting that factor is overwhelming and uncontested, and there is no "evidence that could rationally lead to a contrary finding." ' " (*Ibid*.) Rather, we found "[i]t would be entirely speculative for us to presume, based on a record that does not directly address the aggravating factors, what a jury would have found true in connection with these factors." (*Ibid*.)

This analysis also applies here and forecloses the People's second contention. In the instant matter, as in *People v. Lopez*, at the time of trial, the prosecution was not required to present evidence in an effort to prove

44

aggravating sentencing factors at trial. Cruz "would have had no reason to present evidence that might have contradicted evidence supporting [the] truth of the facts underlying the aggravating factors relied on by the trial court." (*People v. Lopez, supra*, 78 Cal.App.5th at p. 466.) We therefore cannot say, for every aggravating factor relied on by the trial court, that " 'the evidence supporting that factor is overwhelming and uncontested, and there is no "evidence that could rationally lead to a contrary finding." ' " (*Ibid*.) As such, we cannot affirm Cruz's sentence on this ground.

The trial court, in sentencing Cruz, relied on aggravating factors that were neither stipulated to nor found to be true beyond a reasonable doubt by a trier of fact. Accordingly, the sentence imposed does not comply with section 1170, subdivision (b), as amended by Senate Bill 567. For the reasons discussed *ante*, we do not find this error to be harmless beyond a reasonable doubt. We therefore remand the matter to the trial court for resentencing consistent with the current version of section 1170, subdivision (b). (See *People v. Lopez, supra*, 78 Cal.App.5th at p. 468.)

Regarding Assembly Bill 518, the People claim there is no need to remand the matter because the record shows that the trial court would not

have chosen to impose the shorter sentence even if it had discretion to do so.[9] Yet, because we have concluded that we must vacate Cruz's sentence and remand for resentencing, on remand the trial court may revisit all of its prior sentencing decisions in light of all new legislation, including Assembly Bill 518. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

---

[9] Even if we were to address the People's argument on the merits, we find scant support in the record that persuades us that the trial court would not have exercised its new discretion under Assembly Bill 518. Further, the court's comments during sentencing were aimed at selecting the upper term for count 2. And the court appeared to be mechanically following the dictates of former section 654 in imposing the consecutive sentence under count 3 while staying the sentence for count 1. At the time, the court had no discretion to choose count 1 instead of count 3 under section 654. Now it does. "'A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

## DISPOSITION

Cruz's sentence is vacated. The matter is remanded to the superior court for resentencing. In all other respects, the judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


DO, J.


BUCHANAN, J.